## BEFORE THE IDAHO HUMAN RIGHTS COMMISSION

| | | |
|---|---|---|
| **Gregory Marlor**, Complainant | Case Nos.: | H-0424-202 |
| vs. | | |
| | Bases: | Disability |
| **The Housing Company, dba Thomas Logan Apartments**, Respondent | Issues: | Terms/Conditions; |
| Boise, Idaho | | Accessibility |

ADMINISTRATIVE REVIEW AND
COMMISSION DETERMINATION

### BACKGROUND

Gregory Marlor (Marlor) is a disabled individual who uses a wheelchair due to partial paralysis and rheumatoid arthritis. He contracted Covid-19 in 2021, which has significantly affected his cognition. He currently resides at Thomas Logan Apartments (Logan), which is a Low-Income Tax Credit (LIHTC) property, developed pursuant to 26 U.S.C. § 42, and subject to regulations pertaining to rental rates, unit availability, and income. There are a finite and limited number of low-income apartments available in the complex, as well as a finite and limited number of accessible dwelling units that are also low income.

Marlor applied for an apartment at Logan in September 2021. At the time, he qualified for a one-bedroom apartment, unit 504, for $520/month. Marlor did not pass the background check due to a possession of a controlled substance charge on his record which did not have a date associated with it. Marlor alleges that the onsite manager, Renee Miller (Miller), could have easily called Madison County and found that the charge was nearly 20 years old. He claims that management failed to process his application in a timely manner due to his disabilities. During the appeal period, where Marlor supplied the charge date to Miller, other more qualified applicants applied and received the housing. However, Logan offered Marlor another, non-accessible studio apartment, unit 506, for $620/month, which Marlor accepted.

On December 28, 2021, Marlor appealed the application process to rent unit 504. Regional manager Phillip Sylvester (Sylvester) told Marlor that a charge on his record put him into denial status. However, Marlor alleges that the charge was 20 years old, and Sylvester could have easily determined the date of the charge and removed it. He claims that Sylvester gave him misinformation and discriminated against him because unit 504 remained available until April 28, 2022.

Marlor acknowledges that he never submitted paperwork about his disability, but management had seen him in his wheelchair several times throughout his application process. The apartment he currently resides in is not accessible and allegedly makes living his day-to-day life difficult and dangerous.

In July 2022, unit 504 became available. However, Logan informed Marlor that the cost of the unit was going to be adjusted to the updated studio rate of $620/month. Marlor asked for the original documents that qualified him for the $520/month agreement but was denied. He still requested a transfer to unit 504. Marlor was denied because the apartment had already been rented to another tenant. However, Marlor alleges that though he completed the transfer form in July 2022, Logan failed to upload it into the system until October 2022, giving other people ample opportunity to apply to transfer to 504 before him.

Marlor states that Logan apartments use key card entry, which requires him to physically go to the front entrance to let guests in, and guests have no way to contact a resident other than by personal phone. He alleges that this makes daily living more difficult because of his mobility issues and highlights this problem as an example of how non-accessible his living situation is. He claims to have contacted on-site managers, regional managers, and the asset manager about his issues with the front door, but management ignored his complaints. Additionally, Marlor alleges that the front door to his apartment is locked from 5 pm to 8 am on weekdays and all weekend, which is an additional accessibility issue, as he may be locked out of his apartment for a long period of time if he forgets or loses his key card.

Logan states that it is unaware of any state or federal law or regulation that requires it to install and maintain two-way communication at the entrance to the complex and Marlor's apartment. It contends that the complex is locked at night for security purposes.

In July 2023, Marlor was informed that he was #5 on the list to move into a one-bedroom apartment with accessible grab bars, but the rent would be $870/month. Marlor turned it down because it was too expensive, and he believed that the fair price was $540/month, which was close to what had initially been offered in September 2021.

Logan contends that as an LIHTC property, the rent amounts were developed pursuant to federal law and the LIHTC program and apply to all tenants or potential tenants.

A month later, Marlor found out about another fully accessible apartment that was becoming available. Logan informed Marlor could transfer into the unit after repairs were complete. However, Logan later determined that Marlor made too much money to qualify for the lease. Marlor continues to live in a non-accessible apartment.

Logan states that there are no available accessible qualifying apartments it could provide for Marlor, and while it empathizes with his struggle, it must follow state and federal law in relation to LIHTC program qualifications. It also must apply the law uniformly and non-discriminatorily.

## DISABILITY – TERMS/CONDITIONS

The first issue is whether Logan illegally discriminated against Marlor in the terms and conditions of his housing.

*The Idaho Human Rights Act prohibits discrimination in housing based on disability. To establish a prima facie case of disability discrimination, Complainant must establish that he submitted an application to rent an apartment from Respondent, but his rental application was denied under circumstances which give rise to an inference of discrimination. If he establishes a prima facie case of discrimination, Respondent must articulate and offer evidence of a nondiscriminatory reason for its action. Then, the burden returns to Complainant to show that the offered reason is false or a pretext and the real reason is disability discrimination.*

Due to the statute of limitations, only charges that occurred within the last 365 days since the filing date will be considered here.

Marlor alleges disability discrimination in the terms and conditions of his housing because in June 2023, Logan offered him unit 504 at the price of $870/month, which Marlor believed to be too expensive. Marlor then requested to pay the original rent he was quoted in 2021, $540/month. However, after he was denied the lower rental amount, Marlor still applied but did not receive the accessible apartment because it had already been rented to another tenant.

As a housing entity, Logan is legally allowed to set the price of its rental units at its discretion and based on federal housing program requirements. Marlor has not provided evidence that the increase in rental price between 2021 and 2023 was specifically targeted at him on account of his disability, or that he was treated disparately from other tenants of Logan.

A month later, Marlor was denied a transfer to an accessible apartment. Logan states that this was because Marlor's income exceeded the maximum threshold to qualify for the lease. As a LIHTC, Logan must reserve a certain percentage of rent-restricted units for lower-income families. Logan maintains that it followed state and federal laws and policies governing income in relation to Marlor, and that Marlor exceeded federal policies for the low-income, accessible housing. Marlor does not provide evidence that this is false or a pretext intended to conceal discriminatory reasons for rejecting his application to transfer.

Because Marlor cannot prove that Logan discriminated against him in the terms or conditions of his housing, he cannot prevail on this charge.

## DISABILITY – ACCESSIBILITY

The second issue is whether Logan discriminated against Marlor in terms of the accessibility of his housing.

*Various federal laws require housing providers to make reasonable accommodations and reasonable modifications for individuals with disabilities. Federal nondiscrimination laws that protect against disability discrimination cover not only tenants and home seekers with disabilities, but also buyers and renters without disabilities who live or are associated with individuals with disabilities. These laws also prohibit housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because they require reasonable accommodations or modifications.*

*Under the Fair Housing Act a reasonable accommodation is a change, exception, or adjustment to a rule, policy, practice, or service. The Fair Housing Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling and public and common use areas.*

*In addition, the Fair Housing Act prohibits a housing provider from refusing to permit, at the expense of the person with a disability, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises.[1]*

Marlor alleges discrimination due to Logan's keycard system, which requires him to physically go to the front entrance to let guests in; guests can contact a resident through their own personal phones. Additionally, he also claims that Logan's locked door policy, which keeps Marlor's apartment locked from 5 pm to 8 am on weekdays, and all weekend, adds an extra accessibility issue. Finally, his current apartment is not accessible, which he claims makes his day-to-day life difficult and even dangerous.

Logan contends that it is unaware of any law or regulation that requires it to install and maintain two-way communication for each resident, and that the door locking policy is in place for security reasons. Marlor does not provide evidence that this is false, or a pretext for discrimination. He does not provide any law, policy, or regulation that states that two-way communication is a requirement for either non-accessible or accessible housing. Additionally, Marlor does not claim that he tried to install two-way communication at his own expense, nor that Logan refused to permit him from making any reasonable accommodations that were necessary to afford himself full enjoyment of the premises.

Logan claims that the locked door policy is applied to everyone and is put in place for security reasons. This is a legitimate business reason, and Marlor fails to provide evidence that the policies in place by Logan affect him disparately or that these policies were put in place to discriminate against him on account of his disability.

---

[1] Reasonable Accommodations and Modifications | HUD.gov / U.S. Department of Housing and Urban Development (HUD)

Marlor freely accepted non-accessible housing, and at the time that he did so, Logan contends that it was clear that there were no guarantees about future availability or future rental rates. The Fair Housing Act prohibits a housing provider from refusing to permit, at the expense of the person with a disability, reasonable modifications. However, Marlor has not demonstrated that he has tried to modify his living situation out-of-pocket to make the premises more accessible, nor that Logan prevented him from doing so.

On balance, Marlor does not provide sufficient evidence to prove that Logan denied him accommodations that it was legally required to provide, nor did it prevent him from modifying his apartment at his own expense to create a more accessible environment for himself. Thus, Marlor does not prevail on this charge.

COMMISSION DETERMINATION AND ORDER OF DISMISSAL

Based upon the evidence submitted, we find **no probable cause to believe that unlawful disability discrimination has been established**.  Therefore, pursuant to the Rules of the Idaho Human Rights Commission, this case is **dismissed**.  IDAPA Section 45.01.01.300.24.

### NOTICE OF RIGHT TO SUE

This determination concludes the processing of this charge. Idaho law permits Complainants to file court actions, despite findings of "no probable cause" by the Human Rights Commission. A private action under the Human Rights Act must be filed in court within 90 days of the date of issuance of this notice of administrative dismissal. Failure to comply with this timeline may cause Complainant to lose the right to go to court.  Complainant should consult with an attorney if litigation is a consideration.

8/28/2024
Date

Benjamin J. Earwicker, J.D., Ph.D., Administrator
On behalf of the Commission

*as*


DETERMINACIÓN DE LA COMISIÓN Y ORDEN DE DESPIDO

Según la evidencia presentada, acertamos que **no hay causa probable en creer que discriminación por una base del sexo o represalias ilícita se han establecido.** Por lo tanto, de conformidad con las Reglas de la Comisión de Derechos Humanos de Idaho, este caso **se descarta.** Sección de IDAPA 45.01.01.300.24.

### AVISO DEL DERECHO DE DEMANDA

Esta determinación concluye el procedimiento de esta querella. La ley de Idaho permite que Querellantes registren acciones judiciales, a pesar de hallazgos de "no causa probable" por la Comisión de Derechos Humanos. Una acción privada bajo el Acta de Derechos Humanos se debe registrar con una corte dentro de 90 días de la fecha de la emisión de este aviso de desecha administrativa. La avería de cumplir con esta línea de tiempo puede causar que Querellante pierda el derecho de acudir a los tribunales. Querellante debe consultar con un/a abogado/a si se considera el litigio.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 28th day of August 2024, I caused a true and correct copy of the foregoing document to be served as follows:

Gregory Marlor                              [  ] U.S. Mail
Gmanib6@gmail.com                           [X] email
                                            [  ] Via Facsimile


The Housing Company dba Thomas Logan        [  ] U.S. Mail
Apartments                                  [X] email
Contact@thehousingcompany.org               [  ] Via Facsimile

August 7, 2024

Idaho Human Rights Commission

317 W. Main St.

Boise, ID 83735

Via email: rick.rhodes@labor.idaho.gov

RE: Idaho Human Rights Commission Housing Discrimination Complaint; *Gregory R. Marlor v. The Housing Company, Complaint H-0424-202.*

Idaho Human Rights Commission:

This communication is a statement of facts and or rebuttal to The Housing Company's response to Gregory Marlor's Idaho Human Rights Commission ("IHRC") charge of housing discrimination dated April 10, 2024, by Sean H. Costello of the law firm SKINNER FAUCETT LLP. Please consider this communication Gregory Marlor's formal statement of facts and or rebuttal to The Housing Company's response to his IHRC ("Complainant"), Complaint H-0424-202.

> **1. *The Complainant was not discriminated against when he initially applied for housing.***
>
> *a. On October 7, 2021, after receiving Complainant's application to the Thomas Logan Apartments ("Logan"), The Housing Company conducted its routine credit and criminal screening. The screening showed felony delivery of a controlled substance charge(s) out of Madison County, Idaho, but without an associated date of reference. After due and reasonable inquiry using iCourt and other online resources, The Housing Company could not determine the recency of the charge(s), and the Complainant's application was denied.*
> *b. Complainant then subsidized the application by providing the relevant information related to the criminal charges in Madison County and The Housing Company reversed the denial. During the 27 days between the initial denial and the reversal, The Housing Company continued to offer housing to other qualified applicants, in the normal course of its business.*

1. After receiving a denial letter from The Housing Company (THC), Marlor called and talked to THC's on-site manager for Thomas Morgan Apartments (TMA), Renee Miller (RM). She stated that she believed it was a 2003 Madison County case but did not know the charge but

would look in his file and get back to him. After e-mailing RM the disposition of another case she replied informing him that it was case #1-4386 out of Madison County for possession of a controlled substance but it did not have a date associated with it. Marlor has no case #1-4386 and iCourt reflects one possession charge out of Madison County. He took a snip-shot and sent it to her, but she needed to have a copy for his file from the courts to follow policies. He made a call to Madison County and again it was confirmed he only had one charge out of Madison County for possession of a controlled substance, a copy of the disposition was mailed to THC for his file. In 2020 Marlor contracted COVID twice causing debilitating Long COVID symptoms that included brain fog and blood clots that resulted in two minor strokes. He had been wheelchair-bound since June 5, 2020, when he was confined to a wheelchair for 11 months. Wheelchair-bound was a new level of disability and his brain fog affected his cognitive processing, memory recall, and overall mundane functioning. By July 2023, Marlor realized how far his cognitive abilities had regressed when the brain fog had improved, and his downgraded abilities were improving.

    a.  THC's officers denied Marlor Federal Mandated housing because "You were declined for Case #1-4386 at Madison County for possession of controlled substance." Marlor has no criminal case, "#1-4386." He supplied documentation to THC regarding the only possession charge out of Madison County that was 20 years old and was put back on the list.

    b.  THC contends iCourt was utilized and "other online resources" but fails specificity of the other online resources. Further, RM gave Madison County and the charge of but failed to call Madison County to retrieve Marlor's readily available public information; more, THC has a signed release of information. Instead of contacting Marlor, Madison County, or numerous other State entities THC denied him housing.

3.  Marlor provided the court records for the Madison County 2002 possession charge to THC, and he was placed back on the list. However, the 2002 possession charge contradicts the delivery of a controlled substance found in THC's response to his Complaint and in a reply e-mail from THC's regional manager, Phillip Sylvester (PS) dated December 29, 2021. PS's reply email is from an e-mail Marlor sent on December 28, 2021, to RM asking for a review of the

application process where he feels he was penalized unjustly in accordance with the application process and was denied housing and taken off the list. Marlor asks that if the process was not in accordance as written then his original qualifying status be reinstated.

**Thomas Logan** <ThomasLogan@thehousingcompany.org>
to me ▾

Oct 25, 2021, 4:09 PM    ☆    ☺    ↩

Hello,
You were declined for Case #1-4386 at Madison County for possession of controlled substance. If that one was also dismissed, please send us the court decision.

Thank you

🖵 **iCourt Portal - Online records & payments for the Idaho courts**

⊕ ⊕
Smart Search                                                Search Results

## Case Information

CR-2002-1435 | State of Idaho vs. Gregory Robert Marlor

| Case Number | Court | Judicial Officer |
|---|---|---|
| CR-2002-1435 | Madison County District Court | Moss, Brent J. |
| File Date | Case Type | Case Status |
| 04/24/2002 | Criminal | Closed |

2. Marlor attended his last interview and was told that when he was in denied status, he lost his original qualification of a 1 bedroom at $520 because allegedly, qualified people on the list had moved above him and he now qualified for a studio apartment at $620. Marlor voiced his dissatisfaction but asked to be placed on a waiting list and was assured he was on the list. Not only does THC's policies and procedures give "preferences" to persons with a disability, HUD, and The Fair Housing Act mandates compliance in both the application process and accessible housing of individuals with disabilities and or the availability of units to a person considered in a certain class; management cannot say a unit is unavailable,

when it is. In THC's application, a transfer request by a resident with a disability is granted preference and moved to the top of the list. HUD, the Fair Housing Act, and THC all cover persons with disabilities and provide reasonable accommodations. The Fair Housing Act specifies that this is also the case regarding people with disabilities and waiting lists. ADA mandates the standards that must be followed by THC in the housing of individuals with disabilities; including waiting lists. THC claims they follow all laws and statues in their application process and when conducting business; Marlor disagrees.

    a. THC's application states that procedures used for selection of residents will follow laws and federal statutes and regulations.

    b. THC's "NON-DISCRIMIANTGION" and compliance by management with all federal, state, and local fair housing and civil rights laws and will abide with all equal opportunity requirements as required by law, notwithstanding HUD administrative procedures.

Revised 7-23-2021

**RESIDENT SELECTION PLAN**
**AFFORDABLE AND MARKET RENTAL HOUSING**
**THOMAS LOGAN APARTMENTS**

**INTRODUCTION:** The procedures used for selection of residents shall be implemented in compliance with the applicable local, state and federal statutes and regulations applicable to the development.

**NON-DISCRIMINATION:** The management agent shall comply with all federal, state and local fair housing and civil rights laws and with all equal opportunity requirements as required by law, including without limitation HUD administrative procedures. Federal laws forbid discrimination based on race, color, creed, religion, sex, age, disability, familial status, or national origin. Discrimination against a particular social or economic class is also prohibited (for example: welfare recipients; single parent households, etc.) These requirements apply to all aspects of tenant relations including without limitation: accepting and processing applications, selecting residents from among eligible Applicants on the waiting list, assigning units, certifying and re-certifying eligibility for assistance, granting accommodation and terminating tenancies.

**"Federal laws forbid discrimination..." "...These requirements apply to all aspects of tenant relations including without limitation**: accepting and processing applications, selecting residents from among eligible Applicants on the waiting list, assigning units, certifying and re-certifying eligibility for assistance, granting accommodation and terminating tenancies."

(c)  All covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route shall be designed and constructed in such a manner that— (1) The public and common use areas are readily accessible to and usable by handicapped persons; (2) All the doors designed to allow passage into and within all premises are sufficiently wide to allow passage by handicapped persons in wheelchairs; and (3) All premises within covered multifamily dwelling units contain the following features of adaptable design: (i) An accessible route into and through the covered dwelling unit; (ii) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (iii) Reinforcements in bathroom walls to allow later installation of grab bars around the toilet, tub, shower, stall and shower seat, where such facilities are provided; and (iv) Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

**Rules applicable to apartments federally assisted with only federal HOME funding:**
1.  The household's income may not exceed applicable Income Limits designated for affordable units. The limits which apply vary by county and income target for specific apartments.

d.  THC's, "PREFERENCES: Management will observe preferences listed below. The number of preferences per household and then the date/time the application was received determines the location on the wait list." "…Waiting list preference in leasing will be given to households that contain one or more members with a handicap as defined in the Fair Housing Act."

e.  THC's, "Accommodation for Existing Residents: Requests for reasonable accommodation from existing residents requiring unit transfers will take priority over all waiting list Applicants. Accommodation results when a third party-verified disability requires a change or repairs which make it easier for the existing resident to reside in the community. Reasonable costs associated with unit transfers or repairs will be covered by management, unless doing so will cause an undue financial and administrative burden."

f.  THC's, "Units Specifically Designed for Disabled or Handicapped Persons: When attempting to fill a unit that has features designed to meet the needs of disabled persons, management will grant a preference to households with Disabled members (who otherwise qualify) and need the accessible features of the unit. For example, units designed for accessibility to individuals with mobility, hearing, or vision impairments, will be rented to households that require the features provided in those units. This preference will be granted upon proper notification by Applicant and verification of need by management."

g.  THC's, "Transfers for Existing Tenants: Regardless of the Rental Assistance Preference, no waiting list preference shall be granted to households transferring between units in a specific apartment community or between apartment communities located within the same market area which are owned or managed by The Housing Company. Households seeking such transfers shall receive only chronological status on the waiting list."

h.  THC's, "PROCESSING STEPS: The development shall be rented, and occupancy maintained on a first-come, first-served basis with preferences taken into consideration." "The initial application shall be timed and dated when received, and the resident manager shall maintain at the rental office a chronological list of all Applicants (categorized on a bedroom size and, when applicable, income target requirement)." "Preference households and existing residents requiring unit transfers because of accommodation will move ahead of chronological status Applicants. Applicants shall be offered housing (after meeting all selection criteria requirements including the verification process), placed on the waiting list, or declined." "The Applicant must contact the development's resident manager every

90 days to remain on the waiting list. Applicants who fail to provide acceptable

landlord references, credit history or who have a criminal background will be

notified that they have been removed from the waiting list. <u>When an appropriate</u>

<u>unit is available, the waiting list shall be reviewed to identify the Applicant who</u>

<u>meets preference criteria or whose name is chronologically at the top of the list.</u> The

resident manager shall interview the Applicant; confirm and update all information

provided on the application; update credit reports older than one year; obtain

current information regarding income and Family composition as applicable and

necessary to certify eligibility and determine resident's rent payment. The Applicant

shall be informed that a final decision on eligibility cannot be made until all

verifications are complete and current income has been verified."

1. **The Complainant was not discriminated against when he initially applied for housing.**

    c. This outcome is in no way discriminatory, it is the logical and reasonable outcome of conducting due criminal and background inquiry to protect employees and tenants and maintain safe housing, free of criminal and drug activities.

    d. The Idaho Office of the Attorney General apparently concluded the same, according to the Complaint, however the Complainant offers no additional evidence or information to show that the 27-day denial was due to violations of Idaho Code § 67-5901 et seq., and The Housing Company is otherwise unaware of any related discrimination investigations.

    c. Regardless, shortly after reversal of the denial, the Complainant was offered, and accepted on his own volition, a non-accessible apartment at Logan. The Housing Company clearly stated at the time there were no accessible units available and made no guarantees about future availability or future rental rates, as such guarantees as to availability and rates cannot be made.

3. THC contends that Marlor was not discriminated against when he originally applied. One

only has to look at the process used when Marlor was denied housing, put back on the list,

then unfairly stripped of his originally qualifying apartment size and rent amount, and then

given a new qualifying studio apartment for a $100 dollars more a month; further,

conflicting cases by RM and PS. Marlor qualified for a 1 bedroom at $520 a month and then

he received a denial letter stating the reason was because of something in his background check, and that the company that performed it took no part in the decision; he had 14 days to appeal.

a. The court case that RM gave to Marlor conflicts with the case that the regional manager, SP gave him.

b. The documentation that Marlor provided, that reversed the denial, is different than the case THC is contending the reason he was denied housing, no associated date.

c. Marlor's original qualifying 1 bedroom at $520 was lost when he was denied housing because of a 20-year court case and then the denial is reversed when he provides court records to RM for that 20 years-old court case. He asks for a review and PS; the regional manager, contends a 35-year-old court case was the reason for the denial. His new certification qualifies him for a studio apartment at $100 dollars more a month and THC contends in their response to the Complaint Marlor accepted a non-accessible apartment on his own "volition" and THC "clearly" states there are no accessible apartments and make no guarantees for future fees or availability.

d. Marlor is housed in an apartment that has no grab bars by the toilet or in the bathtub. The washer and dryer are stacked and located in the bathroom and does not allow someone in a wheelchair to utilize the dryer or the area for someone in a wheelchair to operate without much difficulty. Further, the bathroom door and hall and the fridge and wall in conjunction with each other do not allow for mobility by someone that is in a wheelchair.

e. THC's response to Complaint states, "After due and reasonable inquiry using iCourt and other online resources," his application was denied. PS's reply e-mail contends he was unable to find the date for the delivery of a controlled substance utilizing iCourt and department of corrections.

f. Marlor states in his e-mail asking for a review of the application process where he was denied housing for a case that was 20 years old, and that RM gave him the information for a possession case out of Madison County. RM told Marlor that information came out of his file, and she reads his e-mail and forwards it to PS, and

he reads his email and yet neither findd any flags concerning conflicting cases; no review was done.

g.  PS's reply ignores Marlor's request for a review of the process used in denying him housing and furthermore states that other qualified applicants moved above him while he was denied status. Marlor's belief is that THC officers' goal was to deny Marlor housing so that he would seek housing elsewhere, or if he provided documentation that they could have easily procured themselves and most likely already possessed, alternatively to void his original certification and recertify him with a studio apartment at $100 more a month. Income and amount of household members did not change; there was nothing that would have changed his original qualifying certification amount, and other applicants moving up on the list would not and should not have changed his original certification amount and reduce his apartment size. Marlor believes that the court case not having a date associated with it was only a ruse after denying him housing in efforts that he would not continue to seek housing at Thomas Logan Apartments. Marlor is disabled and he was not given preference on the list as stated in THC's application "Processing Steps," nor followed Title 24, *§ 8.27,* of Housing and Urban Development. Marlor had been given Madison County by both RM and PS and they were equipped with a signed release of information if needed and could have made one call to Madison County, even with conflicting charges, to find out the alleged missing dates of both court cases; besides, that information is public information. Intermountain Fair Housing Commission did not gather information and denied Marlor's complaint because it is not considered discriminatory when someone's background is the basis for denial. The Idaho Office of Attorney General was a referral from the Intermountain Fair Housing Commission but because Marlor's complaint is not consumer based, he never contacted the Attorney General.

i.  "RECORDS RELEASE AND HOLD HARMLESS" "… authorized representatives of The Housing Company to contact any agencies, police departments, including the Idaho State Police, or any other organization for the purposes of obtaining background information to assist in determining whether I will be suitable as a tenant in the Apartments." THC did not follow mandated administrative practices in the application process, and they did not follow their own non-discriminative practices

and or procedures they state they are governed to follow in "...all federal, state and local fair housing and civil rights laws." Thus, THC's officers showed deliberate indifference to Marlor's disability and the rights he is guaranteed in a plethora statues, practices, and fair housing standards. "Preference households and existing residents requiring unit transfers because of accommodation will move ahead of chronological status Applicants. Applicants shall be offered housing (after meeting all selection criteria requirements including the verification process), placed on the waiting list, or declined." "The Applicant must contact the development's resident manager every 90 days to remain on the waiting list. Applicants who fail to provide acceptable landlord references, credit history or who have a criminal background will be notified that they have been removed from the waiting list.

*Title 24 - Housing and Urban Development*
*PART 8*
*§ 8.27 Occupancy of accessible dwelling units.*

1. *Owners and managers of multifamily housing projects having accessible units shall adopt suitable means to assure that information regarding the availability of accessible units reaches eligible individuals with handicaps, and shall take reasonable nondiscriminatory steps to maximize the utilization of such units by eligible individuals whose disability requires the accessibility features of the particular unit. To this end, when an accessible unit becomes vacant, the owner or manager before offering such units to a non-handicapped applicant shall offer such unit:*

*(1) First, to a current occupant of another unit of the same project, or comparable projects under common control, having handicaps requiring the accessibility features of the vacant unit and occupying a unit not having such features, or, if no such occupant exists, then*
*(2) Second, to an eligible qualified applicant on the waiting list having a handicap requiring the accessibility features of the vacant unit.*
*(b) When offering an accessible unit to an applicant not having handicaps requiring the accessibility features of the unit, the owner or manager may require the applicant to agree (and may incorporate this agreement in the lease) to move to a non-accessible unit when available.*

4. On December 28, 2021, Marlor requested a review of the application process where he was denied housing and subsequently lost the one bedroom and was placed in a studio at a hundred dollars more a month; more, he was told he was placed on a list for a 1 bedroom. He sent an e-mail to RM, and she forwarded it to PS, and he said that there were several cases, but they were old; however, there was one case that did not have a date associated with it and it was a Madison County case, delivery of a controlled substance. He then explained that while Marlor was in denied status that qualified applicants moved above him. He finished with asking if there were any more questions to reach out.

   a. Marlor originally qualified for a 1 bedroom at $520 and questions RM and PS's conflicting court cases that each proffer had no associated date as a reason for denial. He questions the time in denial would change his qualifying apartment size and rent, he questions more qualified applicants moved above him on the list while in denial status, and he also questions the validity of recertifying him would result in qualifying him for a studio at a $100 more; especially, housing him in a non-accessible unit or at least in an apartment that was not equipped with grab bars, stacked washer and dryer, and mobility circumference issues.

   b. Marlor asked to be placed on the list for the next available 1 bedroom and he would have had preference to be placed at the top because of his disability.

2. *Likewise, the Complainant has not been discriminated in his subsequent search for alternative apartments with The Housing Company.*

   a. *Logan is a Low-Income Tax Credit ("LIHTC") property developed pursuant to 26 U.S.C. § 42. As such, it has complex regulatory requirements in relation to rental rates, unit availability, and income. There is a finite and limited number of low-income apartments available in the complex, as well as a finite and limited number of accessible dwelling units that are also low-income.*

   b. *With that in mind, The Housing Company has consistently maintained and applied state and federal laws and policies governing rental amounts and income in relation to the Complainant, not discriminated against him.*

   c. *Thus far a new Logan apartment has not become available to the Complainant either because he was simply over the income limits established pursuant to the LIHTC*

*regulatory regime, or he turned down the opportunity because he disagreed with the amount of rent The Housing Company had established.*

*Greg Marlor <gmanib6@gmail.com>*

*Tue, Dec 28, 2021, 12:23 PM*

*Good morning, Renee. I just need to understand the part of the process where I was denied housing and was removed and lost my position on the list. When I received the letter informing me that due to information on my background check I'm being denied housing. That the agency that performed the background check had nothing to do with this decision.*

*I then called you and I was thinking it was due to a recent charge that was dismissed. However, when I spoke to you you said you'd have to review my file and would get back to me. You replied by email or phone that it was a 2002 Madison County Court case but didn't know what it involved.*

*This is where my confusion not only starts but believe that I was penalized unjustly in accordance with the application process. Those court records are almost 20 years ago and and it states in the application that "Considerations will be granted to applicants with past with past non-violent criminal records occurring five years or more ago with no further criminal record." Further, the said charges do not disqualify me under other felonious reasons and wouldn't fall under, "Declining Applicant" #15.*

*I lost my position on the list for court records on a case almost 20 years ago. You couldn't tell me what the records contained and told me what needed to be done to be positioned back on the list. I believe I stated the unfairness and left it at that! However, as time passes and I'm dealing with the repercussions I reviewed the application process.*

*I would like a review of the denial for housing in accordance with the application process. If the review results find that the application process was not accordance as written then I am asking to be granted original application status.*

*Thanks for your time and consideration,*
*Greg Marlor!*

*Phillip Sylvester <PhillipS@ihfa.org>*

*Wed, Dec 29, 2021, 8:31 AM*

*Good morning Mr. Marlor,*

*I was forwarded the email that you sent to the property yesterday regarding your denied application. Thank you for reaching out and giving us the opportunity to explain our process in making a determination in regards to your application. When we processed your credit and criminal screening on 10/7/2021 there were a few various charges that showed up on the criminal portion of the screening, most of them were quite old and were not used as a determination to deny you.*

*There was one, however, that showed up in the credit and criminal screening report that did not have a date associated with the charge. It was a felony delivery of a controlled substance charge out of Madison County. Since it did not have a date associated with it a search was done in the state repository and the in the Department of Corrections system with no luck finding the case or the case number. Since a date could not be determined for the charge we unfortunately had to deny you as a felony drug charge within the last 10 years is grounds for automatic denial according to our policies.*

*Once you were able to provide record of the date of the charge, the denial was reversed on 11/3/2021. During that time you were unfortunately regarded as a denied applicant and skipped over when offers were made to other qualified applicants. We apologize for any inconvenience this might have caused, but due to the information that we had you were not qualified for that nearly month long period between your denial and approval.*

*It looks like you have been offered a unit at Thomas Logan and we very much look forward to providing you with affordable, safe, and stable housing for years to come.*

*If you have any questions, please do not hesitate to reach out.*

*Thank you*

**Greg Marlor <gmanib6@gmail.com>**

**Jan 3, 2022, 9:00 AM**

5.  PS made it clear that if Marlor had any more questions, not to hesitate and reach out.

    Marlor did just that and replied to his e-mail stating his confusion over RM and him having

conflicting cases and was denied housing over court case, one 20 years old and the other 35 years old. Further, the court case that he gave RM and got him back on the list for TMA is different than the one he says denied him housing; his formal request of a review was ignored or there would have been communication letting him know he needed to provide court records for the delivery charge out of Madison County and begs the question the need for it in the first place. Below is a snip-shot of the charge PS is referencing and it clearly has a date listed and does not have the corresponding case number associated with it that RM supplied.

```
=============================================================
                      CRIMINAL HISTORY

================================= CYCLE 1 =============================
------ ARREST ------
DATE OF ARREST:          10-11-1988        /
ARREST AGENCY:           ID001015C  IDOC-IDAHO STATE PENITENTIARY
PRINT ID.:               ID00009940087
CHARGE:                  1
  OFFENSE LITERAL:       DELIVERY OF A CONT SUBST
  STATUTE:               37-2732
  SEVERITY:              FELONY
                                              Page 1 of 7
```

*Hello good sir and thanks for reviewing and replying to my email.*

*When I received the denial letter I was crushed. With all that's happened over the last three years i wasn't quite sure what I was going to do. One thing I was sure of and that was to never waver from standing up for what is right, for what I believe in. In the past it was easy to settle and avoided conflict  and not feel uncomfortable. Another character flaw is I put too much trust in people. So please don't think my inquires into this matter is anything other then me wanting to make sure i didn't lose my application status unjustly.*

*I want to give thanks to the Housing Company and other entities that are constructing Thomas Logan Apartments. When housing comes available that allows rent to be adjusted based on income and constructed for those with and without physical limitations the gratitude is wide spread and appreciated.*

*Back to the matter at hand. When I obtained the documentation from the courts and met for my second interview I was relieved and grateful to be back on the list. I'm still grateful but have mixed emotions and am a little frustrated especially after reading your email.*

*I understand the process and policies of the application process. They are important and are put into place to not only guide but to avoid future problems that have derived from the past. That being said, your email not only doesn't resolve the issues it conflicts with what happened. The case and the a possible reason for no date is for something that happened over 35 years ago.*

*When I received the denial letter it said I had 14 days to appeal! On June 9, 2021 I had a charge dismissed and thought that was the reason for the denial. I'd given authorization to contact the FBI if The Housing Company deemed it necessary to do a thorough background check. Instead, I was denied housing for a case that occurred over 35 years ago because of a clerical error. Department of corrections, Madison County, State Police, or even Ada County Sheriffs Office could have verified the date of that case.*

*I find your application process very comprehensive and detailed. It reflects an experienced and knowledgeable organization. Yet with the available resources and tools the course of action taken was denial. This leads me to believe others are behind the scene pulling strings.*

*The denial letter stated that something had been reported in my background check. I called and talked to Renee and she told me she would have to check my file. She then contacted me and gave the 2002 date and county, Madison. The case in your email and the case documentation I procured from Madison county are not the same case.*

*To summarize, I was taken off the list because of a case with no date. I was put back on the list with documentation I received from a county and year that Renee gave me. When it's all said and done the year and county of one case has nothing to do with the other case, other then the same county????*

*Someone may have made a wrong judgement call. It's hard to say when there are two conflicting storylines. Not sure how to fix something that in my belief shouldn't have taken place in the first place. I do know that someone should be able to explain but in reality I may never know the whole story!*

2. *Likewise, the Complainant has not been discriminated in his subsequent search for alternative apartments with The Housing Company.*

    d. *First, the Complainant's eligibility is based on income limitations required under an applicable LIHTC set-aside test. There are limitations on what the Complainant's income can exceed in related to the relevant Area Median Income ("AMI"). The set-aside test Logan uses is irrevocable and was determined pursuant to federal law at the beginning of the project. See U.S.C. § 42(g)(1).*

    e. *Each time the Complainant has requested an accessible unit at Logan, that request was routed to The Housing Company's Compliance Department ("Compliance") to determine qualification pursuant to the set-aside test. However, any available units were at a 30% set aside, whereas the Complainant needed a 60% set aside to qualify.*

    f. *To the Complainant's stance that he will not pay a rental amount greater than when he first applied for a Logan apartment in 2021, the LIHTC program also defines how rent maximums are developed by program participants. In other words, the rent*

*amounts the Complainant has objected to were developed pursuant to federal law and the LIHTC program and apply to all tenants or potential tenants; not arbitrarily or discriminatorily to solely prevent the Complainant from obtaining an accessible apartment.*

6.  Marlor can only conclude there was no waiting list and THC's records will reflect that at the time Marlor was denied housing, at the time he supplied documentation to a conflicting case and denied status reversed, at the time he attended his last interview and was informed he lost the 1 bedroom at $520 and his new qualifications were for a studio at $620 and would be placed on a waiting list for a 1 bedroom; there were several apartments available at Thomas Logan. Marlor moved into a studio apartment on February 15, 2022, and a minimum of two apartments were available, units #504 and #511. #504 is a 1 bedroom with grab bars in the shower and bathtub with separate laundry room. #511 is a 1 bedroom and has 2 peepholes in the door and separate laundry room. Moreover, at the time of moving into his studio, he again confirmed that he was on a waiting list; he asked Renea how long the waiting list was, and she said, "A long time, about a year." As per the Memo by Renee, dated April 1, 2022, she states, "Now that most of the units are filled…"

7.   After his neighbor had moved out of unit #504 in July and was waiting in the foyer for a ride, Marlor asked him when he was approved for his apartment? He said, "He applied on the 25th of March and was approved the 28th. Meaning, unit #504 had never been occupied and is considered "empty," and had not been assigned or designated as a particular unit during the time Marlor was in denial status and taken off the list and when it was reversed and put back on the list. In fact, #504 remained empty through his last interview, through his move in date of February 15, and it remained empty until after March 28, 2002, when his neighbor moved in. Units that have never been occupied are considered "empty" status as defined in Idaho Housing and Finance's Compliance Manual:

## Unit Status

The following terminology defines unit status that should be considered when leasing units in a LIHTC building:

- Vacant Unit: LIHTC unit, which a qualified tenant has vacated.
- Empty Unit: LIHTC unit that has NEVER been rented.
- Market Unit: Unit without LIHTC, occupied or not.
- Occupied Unit: LIHTC unit that is currently rented.

### Empty Unit

Units that have never been occupied are referred to as empty units rather than vacant

units. Empty units <u>cannot</u> be counted as low-income units, but they must be included in the building's total unit count for purposes of calculating the applicable fraction.

According to the definitions above, it is considered a best practice to rent empty units before renting vacant units. Empty units are not eligible for tax credits until an income-qualified tenant rents the unit. Therefore, the initial tenant gives the unit its tax credit status.

---

DATE:        April 1, 2022, 2022
TO:          Thomas Logan Residents
FROM:        Jennifer Rogers and Renee Miller
SUBJECT:     Building Operations and Conduct

Welcome to Thomas Logan Apartments.  Now that most of the units are filled, we have a few housekeeping items to address:

1. As per THC's response, "...eligibility is based on income limitations required under an applicable LIHTC set-aside test." They further descript the limitations of Marlor's income in his, "Area Median Income("AMI")." Where Marlor is and was discriminated, and with malice, is what THC's officers did to his qualifying determination. "The set-aside test Logan uses is irrevocable and was determined pursuant to federal law at the beginning of the project. See U.S.C. § 42(g)(1)."

   b. As stated, the set-aside test is "is irrevocable," and yet that is what THC's officers did with Marlor's original determined qualifying LIHTC set-aside test, they changed it. How? Once his original qualifying amount was determined at $520 for a 1-bedroom

apartment, they denied him housing by conjuring up a charge that did not have an associated date. Further, they utilized his background, and his background cannot be considered discriminatory and Marlor had signed "RECORDS RELEASE AND HOLD HARMLESS." They denied him housing because of his background check and then once he provided the missing date, he was put back on the list for an apartment, but they ran a new set-aside test and gave him a new qualifying amount of $620 and a studio. Further, because they discriminated against Marlor utilizing his background check and he had had signed a release,' "Records Release and Hold Harmless;" and created umbrella of immunity. Marlor believes that an entity cannot create an umbrella of protection, and break the law or discriminate, and receive immunity.

c.  THC's officers denied Marlor Federal funded income-based housing and said it was because he had a criminal court case without a date attached to it.

b.  THC's officers then changed his qualifying amount when they put him back on the list from $520 to $620 and housed him in a studio apartment that is non-accessible.

e.  At his last interview RM informed him to be placed on the list for a 1 bedroom.

f.   He asked for a review of the process used to deny him housing and was given conflicting cases by RM and PS and a review never happened.

g.  THC's records will reflect at a minimum #504 and #511 had the status of "empty" and were available until after he moved in and signed the lease for #506, a studio apartment.

h. THC's answer to the Complaint states that, "…27 days between the initial denial and the reversal, The Housing Company continued to offer housing to other qualified applicants, in the normal course of its business." Even if this was true, Marlor would have been moved at the top of the list per THC application process and Title 24 - Housing and Urban Development, PART 8 § 8.27 Occupancy of accessible dwelling units.

*2. Likewise, the Complainant has not been discriminated in his subsequent search for alternative apartments with The Housing Company.*

g.  *Further, The Housing Company did more than simply look for possible housing accommodation at Logan, it also looked at each of its nearby complexes in hopes of finding an available accessible unit but was unable to find something that fit*

> *within the set aside.*
>
> h. *This issue remains outstanding today. The Housing Company's Compliance Department analyzed the Complainant's income again on May 13, 2024, and, based on 2023 income recertification numbers, he would still need to be in a 50% or 60% set aside to qualify (40% income limit: $24,960, Complainant 2023 income: $25,132.80).*
>
> i. *There are simply no available accessible qualifying apartments for the Complainant. The Housing Company empathizes with the Complainant, but it must follow state and federal law in relation to LIHTC program qualifications and it must apply the law uniformly and non-discriminatorily.*

8.   In July of 2022 it was brought to Marlor's attention that #504, a 1 bedroom was coming open and he talked to RM, and she said yes, that he needed to fill out a transfer request. She stated that the apartment would be $739, and Marlor requested documentation of his original qualification and to please give him the email addresses for the regional manager and assets manager. As one can read the texts below, once Marlor was ready to turn in the "Transfer Request" for upper management approval, Renee told him that someone else was interested in #504, and in fact, had rented it out. Marlor made it clear that that she had been involved with him being denied housing, gave him the possession of a controlled substance and the county, told him he had lost his original qualifying rent amount and apartment size, told him his new qualifying studio and amount, informed him that he would be on the list for a 1 bedroom, and then denied him the transfer to unit #504 at $739 a month.

1.   He turned in the transfer request and in July 2023, found out it was not uploaded until October of that year. Meaning, upper management never reviewed his request for the transfer.

   b.   THC's response to the Complaint contends that Marlor refused to pay a higher amount in rent and that is not true. He asked about the documentation of his original qualification amount and RM had this to say, "I can tell you right now they're not going to give you the one bedroom for $520 the remember I told you the one bedroom is now 739 and you would have to see if your income qualify for that amount And not even sure if they're gonna leave and let anybody transfer from a studio to the one bedroom."

c. Marlor's disability, his original certification, his housing denial, a court case with no associated date, him supplying court records and denial reversed, qualifying applicants moving above him on the application list, new certification placing him in a studio at $100 more a month, him being placed on the waiting list for a 1 bedroom, his asking for a review; is exactly what should not happen to someone that is disabled and is discriminatory in every phase of him trying to find housing and being treated fairly.

d. Marlor was denied the 1 bedroom he was on the list for and was accessible with grab bars, laundry room, and mobility circumference; unit #504 was available, and considered empty, until after March 28, 2022. Marlor believes that him informing RM of the practices that were followed were considered discriminatory, that THC moved her to a new location because not long after she was replaced by Adam.





3. Finally, the Complainant makes a series of accusations related to his being discriminated against in relation to Logan building access and two-way communication.

    a. The Housing Company appreciates the Complainant's concerns here and is willing to discuss potential reasonable accommodation(s), but the Logan complex does not currently have two-way communication systems in place for communication between those at the entrance and individual apartments.

    b. The Housing Company is further unaware of any state or federal law or regulation that requires it to install and maintain two-way communications at the entrance to the complex and the Complainant's apartment, which is simply locked at night for security purposes for the benefit of all tenants. The Complaint alludes to laws that might require The Housing Company to provide a way for the Complainant to allow after-hour visitors into the building but did not cite to any specific authority.

    c. While it is clear the Complainant is frustrated that he cannot electronically allow his visitors into the building at night, he does not make substantive factual accusations of discrimination based on accessibility. It is also not clear the Complainant has reasonably engaged The Housing Company on these issues until filing his IHRC discrimination complaint.

9. Renee left that Fall and was replaced by Adam (Last name unknown). Marlor started the process of getting moved into a 1 bedroom with him and trying to get the app utilized by the office rental people on the 2nd floor and Lucy Apartments attendants next door; the same owner as Thomas Logan Apartments. Marlor knew it was available because he returned from Eastern Idaho at 2 AM and had no way to get into the apartments. He informed Renee

and she told him that if that was ever an issue, he could call her, and she could unlock the door. At first Adam did not acknowledge the app, but eventually conceded that it was available, but they were not going to let the attendants in the TLA have access to utilize it.



10. Before Adam arrived Marlor had emailed the new regional manager, Erika Zappa. After not hearing back from her he called the corporate office and found out she had left that position and Kim had taken over. He left and message for her and forwarded the email he had sent to Erika.

*My best educated guess is that Erika is the highest possible contact I have at this time so please forgive me if I'm addressing my issues to the wrong person.*

*I moved into Thomas Logan apartments in the middle of February and was grateful to have housing and move out of the situation I was in. Before being denied housing and taken off the list, I qualified for a one bedroom and approximately a hundred dollars less in rent.*

*I feel that I have been discriminated against during and after the application process. I'm asking for a second time for a review of the process that denied me housing and being placed on the list for a one bedroom apartment.*

*I will be happy to give you exact dates but for now keep to an overview of what's transpired. I believe after the second interview is when I was given the information that I qualified for a one bedroom at the cost of $520.00. Sometime afterwards I received a letter informing me I had been denied housing…. The decision was based on information that was found during the background check. I now question the validity of both of the reasons I was given for the denial for housing.*

*I called and talked to Renea and she stated that the reason I was denied housing was that there was a criminal case that had a county and date but no charge was listed. She then gave me Madison County and the year 2003.  I told her I would supply her with that information. I contacted the courts and they easily mailed me a copy of the charge, date, and county.*

*The next interview I was informed I had been taken off the list because I was denied housing. However, because I supplied the missing information I had been put back on the list but now qualified for a studio at the monthly rent of $620.00. I stated it seemed unfair but understood the policies in place. I asked to be put on the list for the next available one bedroom and was told that there was a long list but was assured that it would be done.*

*As time passed and the move in date pushed out I wanted to inquire about the possibility of me being treated unjustly. I wrote the following end mail to Renea:*

Note: The email to Renee and reply from Phillip were previously given.

*I replied to Mr. Sylvester's email stating the undeniable confusion I had between Renea's reason for being denied housing and further the required documentation that got me back on the list. Especially when being denied Federal subsidized housing and the criteria one has to go through to be approved. I might add that he stated at the end of his email to reach out if I had any more questions yet my reply email went unanswered.*

*There are several questions or issues that need resolved where I believe my Rights have been violated! Intentionally or not intentionally is a question I would also like answered. Another issue  is the waiting list I was put on! I now believe there was no waiting list and was only used as a reuse for what was really taking place!*

*I was first told I would be put on a waiting list when I was informed that I had been taken off the list and lost my one bedroom and qualified rent. It was discussed again when I moved in and Renea told me the list was about a year long. After my neighbor said he was moving out I went to Renea and we discussed the waiting list and the availability of the one bedroom. This is when I realized that there was no waiting list. My neighbor said he was moving out at the end of the month. I spoke to Renea about his apartment and the list I was on. It was a Wednesday and she said she had to be out of the office on Thursday and to fill out the "Transfer Request Form" and return it on Friday. Friday morning after speaking to the paramedics and two police officers Renea informed me that she was too busy to see me and it would be Tuesday before she could meet with me! She stated that there were people already interested in the apartment and she would be showing it to them. I stated that I would still like to turn in the request and she said Tuesday. I turned the request in on the following Tuesday as requested.*

*The last day my neighbor was at the apartments I spoke to him and asked him when he filled out the application for Thomas Logan. He stated that he filled it out at the end of March and received word of acceptance a few days afterwards. If that's the case then there was never a waiting list for me.*

*A few weeks ago I was coming into the building and Renea introduced me to my new neighbor. I was not given an opportunity to transfer into the available one bedroom even though I had been waiting and put on a list.*

*There are several issues that need to be addressed. The biggest is me being denied housing and taken off the list. Because of the way I'm being treated I now look at the process of being denied housing as an excuse to keep me from getting an apartment at Thomas Logan.*

*I appreciate your time in resolving my concerns.*

**Thanks, Greg Marlor!**

11. Marlor had left a message for Kim, and she never responded to his e-mail, but she eventually called him back. She informed him that she would have Adam pull his file and the three of them would meet and discuss the 1 bedroom. Adam pulled his file and told Marlor that Kim approved the transfer, and they were going to get him into a 1 bedroom. He also stated that there were mistakes made in his paperwork and in fact there were a lot of mistakes made in a lot of residences' paperwork. In a txt dated December 22, 2022, found below, Marlor asked Adam if the regional manager was going to be in and Adam answered that she was and would let him know; Marlor never spoke to Kim again.

12. Adam did nothing for Marlor except tell him for three months that he was going to get him moved at the first of the month. Marlor also explained that the front door is a barrier, but he did issue keycards at almost every request. January into February Adam was telling Marlor to get ready but towards the end of February he said the move would happen the first of March. He had a couple of friends help get the place ready for inspection and help pack his belongings, but nothing ever transpired. Towards the end of March, he told him the same thing and was having issues with the keycards and losing them and having friends not be able to get a hold of him because they had a dead phone and no way to contact him to let them in the building. Also, Marlor had lost his card so there was no way to get into the building other than to wait until someone came in or was leaving.





**Greg Marlor** <gmanib6@gmail.com>                    Sat, Apr 8, 2023, 8:59 AM    ☆  ☺  ↰  ⋮
to Thomas ▾

Adam. I sent you a txt but no response. I need the video for the building preserved for the night of the 5th to determine who was in my apartment. I know video is only retained for so many days so please make so it isn't lost. I didn't fall asleep until until 3 am. I hadn't been feeling good so I'd been pretty much bed ridden and need to know who was in building in the AM that I associate with.

The last three nights and today (Saturday) the doors have not been locked and that contradicts what you have said about security of the building. I don't care if they are going to remain unlocked at all times but would like to know if that's the case?

You've told me the last two months that I would be moving into the one bedroom and when the first comes nothing happens. I had Wendy here to help me the first of March and Justin around the first of April. No communication whatsoever and here it is the 7th of April.

13. Adam had an incident in one of the apartments where someone was staying that was not
    authorized and he sent out a memo that the door was going to be keycard entry 24/7.
    Marlor was upset and called Kim several times but could not get through. After the third
    time he asked to speak to a regional manager and did not care if it was Kim or not. He was
    transferred to Mindy. He explained the issues with the door being a barrier and how difficult
    it was to have to go down to let his visitors in and that with his disability that it was not

always within his ability to physically go let someone in the building. She mentioned issuing cards to friends, but he explained that avenue had been tried but is impractical and creates more security issues. She said that she would investigate the issues that were taking place and get with Kim. Adam packed up and left in the middle of the night and moved back to California.

14. There was a fill-in site manager for a long period of time and as soon after Roseanna had been site manager for a while Marlor then approached her and informed her that Adam was transferring him to a 1 bedroom and she stated that Adam was supposed to do a lot of things, but he was number 5 on the list. She also informed him that Mindy was the new regional manager. Marlor called and left a message with Mindy.



15. Mindy returned Marlor's call and stated that she would be down to the office and pull his file and review it and asked that he forward all the emails and text messages to her and that she would keep him informed. Roseanna informed Marlor that Mindy had an approved the transfer and then after discussing what apartment was available Marlor decided on taking unit #504. Marlor also started to communicate about the keycard entry and the front door being a barrier to Roseanna and the hardships it was causing him. He asked her to look up

the ADA standards and told her that was her job. He had been locked out and again discussed the door and the locking system being a barrier and she said, "According to you." Marlor then emailed her codes that needed to be followed and she never replied. Marlor had sent all of the communication between the regional manager and site managers to Mindy, but she never responded so he called. It was on a Thursday, and she answered, and she was busy with a project, she said she would return his call on Friday. He has never heard back from Mindy.

*Mindy,*

*I know you are just getting up to speed on everything that's happened with me and the manager said you approved me to transfer to a 1 bedroom and thank you for that but as of now I think I'll have to pass. I told her I wanted to move and after thinking about it and knowing what I qualified for at first and what it would cost per month it's just something I'm not interested in... What's really killing me is trying to live in regular housing when I need to be in an accessible apartment. I think it would be obvious when I roll around here in a wheelchair since I've moved in.*

*In my email to Phillip I mentioned for a good part of my life I avoided confrontation and dealt with the negative consequences of not standing up for myself.  This all changed while fighting charges that Ada County Sheriff's fabricated and therefore the State maliciously prosecuted. After discovering the video the deputies didn't disclose the State dismissed the charges. However, the damages from Long Covid and jail medical keeping me in a wheelchair for 11 months are still big issues in my life. As a result I did promise myself that no matter what I'll stand up for what was right and take on confrontation. It's an ongoing battle and it's not easy and brings me to Renee and Phillip.*

*It's been just over 1 1/2 years since I've lived in Thomas Logan apartments and I'm not very happy with the way management has treated me and ignored my ongoing complaints. You are now the 4th Regional Manager and the 3rd Manager downstairs and we are finally addressing my issues. This is a sore subject with me and I believe anyone that reviewed what's taken place and how I've been treated and the reasons given to me will have the same disposition as I do if not worse. We both know that this place is strictly regulated and has to meet Federal guidelines that include processing applications to ensure candidates are screened for past or current criminal charges and are placed according to financial capabilities.*

*I was approved for a one bedroom and rent was $520 a month and then received a letter informing me I had been denied housing because of something in my background. If I had a past charge out of Madison County in 2002 that had everything but the charge listed as Renee claimed or even a charge out of Madison County that had a charge listed and no date*

*as Phillip claimed; then why not do your job and contact Madison County or any other agency that would readily have that information. I can't even come up with a scenario where if this actually happened that you would deny someone Federal Income Based Housing and use the excuses they used. It's beyond my abilities to go to such lengths but I know it took one phone call to have the information given to me and sent in the mail. Just one phone call to Madison County and I was given the missing charge that Renee said denied me housing.*

*If I had not been suffering from Long Covid, had not just got out of jail, and processed Renee's information as the charges that were just dismissed; I would have never let Renee send me down the rabbit hole to retrieve what is public information. Never mind sit on Phillip's excuse where he gives me a totally different scenario and then states:*

*"Once you were able to provide record of the date of the charge, the denial was reversed on 11/3/2021. During that time you were unfortunately regarded as a denied applicant and skipped over when offers were made to other qualified applicants. We apologize for any inconvenience this might have caused, but due to the information that we had you were not qualified for that nearly month long period between your denial and approval."*

*There are several issues but one of the biggest is their stories don't match and I was placed back on the application list for a different charge then Phillip gives. However, both scenarios could have a person taken off the application list but what really sinks their story is the fact that the 1 bedroom next to me was vacant until April 28, 2022 when my old Horseshoe Bend neighbor's application was approved. I may be off a day or even a month but the fact that I was denied Federal housing and taken off a waiting list that didn't exist for any other reason than officers of Thomas Logan Apartments didn't want me to become a resident. Then, after supplying information to complete a ruse I had my rent raised and the size of my apartment reduced. If that wasn't enough I've been brushed off, ignored, lied to, and flat denied a transfer to a one bedroom. As per Renee, "you are not going to get that apartment for what you originally qualified for." That's what she told me after requesting my original paperwork be found and in the end she gave the apartment to someone else and my transfer request didn't get uploaded until three months later.*

*The reason for the timing of this email is due to my health issues and the inability to get out of bed and get into my wheelchair to go open the door downstairs. As I've tried to express to everyone of the site managers and I believe you are the second regional manager, that the system in place is a barrier. Even if it wasn't considered a barrier, anything that doesn't allow me to live and enjoy my home can be submitted as a complaint and reviewed, especially where I'm disabled.*

*I've had two years to file a complaint and start legal proceedings and that doesn't take into consideration the timeline being paused once a complaint has been filed. As I take everything under consideration it's my belief that I'm going to have to seek the courts to find any relief for clear violations of my housing rights that originated during my application process and continued even today. If I would have been placed in the unit and at the cost I was certified for then my rent would have adjusted from $520 instead I'm offered a one bedroom at $858. I can't afford that and all things considered I can't imagine anyone that knows what transpired would want to be involved offering it to me. I was hoping to hear back from you*

*once you had time to pull my file and review it. I know after Adam reviewed it all he could say
is mistakes were made and you weren't the only one.*

*I'm sorry this has to fall on your shoulders and am going to leave all options on the
table to get this resolved. I know that problems such as these get run up the ranks just as
easily as they get run down the ranks. I don't have the answers or I'd shoot away and honestly
would have to know about the financial certification and how I was approved for a one
bedroom and why the cost would go up even though I was placed in a smaller apartment. I
would think at the most I would be placed in a smaller unit and the cost would have gone
down. I leave those questions to you and will wait to hear back from you.*

*Thanks,*
*Greg Marlor <gmanib6@gmail.com>*
        *Aug 7, 2023, 3:51 AM*

16. Roseanna showed Marlor unit #504, and it had grab bars by the toilet and in the bathtub
    and a separate room where the washer and dryer were located; they were not stacked.
    Marlor reflected on paying $858 dollars a month and decided to turn the apartment down
    stating he could not afford it. To this point he paid $640 a month and cannot figure out how
    his rent had been raised $20 but the same apartment has gone from his original certification
    of $520 to RM's quote of $739 and now his rent was going to be $858; in the end he makes
    too much money to be placed in an accessible apartment, or for that matter, a one bedroom
    that he originally qualified for? He then inquired about a fully accessible apartment, and she
    said one was not available. However, about three weeks later he heard that one was
    available and asked Roseanna about it, and she said it would not be available for a couple of
    weeks but yes, he could take it as soon as the repairs were made. A couple of weeks went
    by, and he had also been talking to Mike who oversees maintenance. They both said that the
    air conditioning unit was fixed and was waiting for a part for the fridge, but it was always
    next Monday, next Monday. Mike finally said that the fridge could be moved over from unit
    #506 and he was just waiting for Roseanna.

**504** | Housing 2021/Thomas Morgan Apartments ×

T    **Thomas Logan** <ThomasLogan@thehousingcompany.org>                    Tue, Aug 22, 2023, 10:38 AM
to me ▾

Good morning, Greg,

504 is vacant. Are you still wanting to transfer to this 1-bedroom unit?

**Roseanna Dean/** Resident Manager

    **Greg Marlor** <gmanib6@gmail.com>                    Aug 22, 2023, 12:28 PM    ☆  ☺  ↩  ⋮
to Thomas ▾

I just talked to Mindy and she said she's slammed and will read my email word for word and get back with me tomorrow. So please give me until I talk to her because I need her to at least read my email before I commit to anything……

⋯

T    **Thomas Logan** <ThomasLogan@thehousingcompany.org>                    Aug 22, 2023, 12:50 PM    ☆  ☺  ↩  ⋮
to me ▾

Sounds good. I can do that for you.

⋯

**Greg Marlor**                    Aug 28, 2023, 2:29 PM    ☆
Hi! I guess Mindy isn't going to get back with me so I'm going to have to decline on 504. I sent her another email on Friday and s…

    **Greg Marlor** <gmanib6@gmail.com>                    Aug 28, 2023, 2:29 PM    ☆  ☺  ↩
to Thomas ▾

Hi!

I guess Mindy isn't going to get back with me so I'm going to have to decline on 504. I sent her another email on Friday and spoke to her once before that and she said she'd get back to me….. sorry to hold you up.

⋯

17.  Marlor's health was not doing well even though his brain fog from Long COVID was starting to subside, his PTSD was more prevalent. Marlor's father had been having health issues and the family consensus was he was not going to be with them much longer. The accessible unit was put on hold because the asset manager was retiring and the person in charge of managing the paperwork resigned. Marlor called the regional manager, Jennifer Rogers, and left messages because Mindy did not return his call. After two months Jennifer returned his call, and he communicated he was working with the 4th regional manager, the 3rd onsite manager, and ongoing discrimination she offered him a 1 bedroom for $600. However, he knew Roseanna and Mindy were supposed to be meeting and discussing his situation and

wanting to be politically correct, he informed Jennifer of the meeting and said, "Why don't the three of you get together and come to some kind of consensus and let me know." He never heard back from Jennifer.

**Greg Marlor <gmanib6@gmail.com>**

Mon, Oct 30, 2023, 12:51 PM

to Thomas

Hi Rosanna,

We'll I just found out that I'm not getting the money for my car so I'm going to have to pay two months worth. I was reading the letter you sent about getting help with rent and it saying that rent couldn't be waived. Then it said something about reasonable accommodations and then I thought that there may be something that could be done about all the late fees for last month I paid and the late fees for this month.

I get paid Wednesday and I need to get caught up. If I have to I'll pay next month and this month late fees included. However, the reason I'm behind is because my dog got operated on and the cost of traveling to Eastern Idaho and back sunk me. I thought that agency was going to help but no. They told me if I received an eviction notice to resubmit. I'm not going to go through that and be waiting another three weeks.

I have a doctor's letter for a companion animal, Bleu, and am hoping we could somehow work out with accommodating me by waving the late fees I've paid and the late fees for this month, then allowing me to make half a payment for past rent and I'll pay a full months rent for November at the same time. Then in December get caught up by paying the other half months rent and December's rent?

If not again I'll pay everything the first but it won't leave me much. When I spoke to Jennifer she said something about charging me six hundred something for the ADA apartment and I didn't acknowledge her because I said something to the affect of getting with you and Mindy and agreed and the phone call ended. I know this this doesn't apply to you other then current manager but I will be filing a lawsuit I just don't see myself living with what has gone on and not doing something about it.



Greg Marlor <gmanib6@gmail.com>

*Wed, Dec 6, 2023, 3:53 AM*

to Thomas

Roseanne,

I've been so sick and like I said I was locked out Friday night for an hour and then again for another hour Monday night; I didn't have enough strength to transfer from my wheelchair to the shower chair and fell hurting my back and ribs. Not only that but my phone was out by my bed so I couldn't get up in my chair and it's taken me most of the night to get back out to my phone. Problem is I can't call anyone because I can't go let them in.

I can't even begin to explain how pissed off I am about this whole situation. The Housing Company has done everything they can to make my life miserable and continue to disregard my ADA rights even though it states it in the application, policies, and even in the three day notice you sent me, that The Housing Company doesn't discriminate.

I know different and have spoken to 4 regional managers, and your asset manager and yet we are almost at two years I've been in the apartment I pay 100 dollars more then what I qualified for and it's not even the one bedroom I not only qualified for but was lied to about being on a list that never had been established because it was open the whole time.

For weeks I was told that as soon as a part came in I'd get transferred. Then after that I went weeks and being told you didn't have the person anymore to do the paperwork. Yet, you are telling me the proof of income I gave was out of date per your paperwork person? There has been several move in

*the building but yet here I sit in a studio that I can't do laundry,  reach the cupboards, microwave, there are no bars in the bathroom, can't look out the peep hole, and it doesn't matter if I want, can't, or shouldn't go open the front door I have to if I have a visitor.*

*As far as Mindy goes I spoke to her one time and she requested I get her all the previous emails I've sent and received over the one and a half years trying to get my issues resolved, along with her telling me she would keep me informed, never heard back from her so after a month I called her back and she said she was way deep into a project that she'd call me back the next day........nothing!*

*So I had already put a call in to her boss, actually had called her boss several times and two months later received a call back and after listening to me give all the discrimination The Housing Company has and is still putting me through she said something along the lines of giving me a one bedroom for 600. The dumbass I am and trying to be politically correct, I told her that you and Mindy were supposed to be meeting about me so why don't the three of you get together. I don't know maybe almost two months ago. Nothing since, not a word, not a sign, nothing from Mindy or her out the door boss the Assets Manager! The only thing I heard was when you sent me an email on the 28th asking me if I'm still interested in 307.*

*I'm very ill Rosanna and dragged my wheelchair out to my bedroom where I eventually was able to get up into my chair and then into my wheelchair. The floor is cold, the trip out to get to my phone was painful, and I don't know how I gathered enough strength to get off the floor and into the chair. So now if I don't end up calling 911 it will be a miracle but to add insult to injury my dad is being put on hospice and won't be with us much longer. I missed my sister's funeral in 2021 because I was so ill from Ada County Sheriff's misconduct, and if my health keeps me from my father's funeral, I promise I will spend until my last days never letting The Housing Company and the owner of this building forget what they did to me!*


*Please, forward this to both asset managers and to our new regional manager. Sorry to have addressed this to you but at least I know for a fact I'll be seeing you. As for the rest, it doesn't matter they've chosen my course of action. I was going to pay online but when I couldn't change the amount and pay the 800 I owe I decided to get a money order and not pay the 30 or 35 online fee. Then after being so sick and getting locked out twice, I couldn't muster getting a money order and now, no way am I going to get that payment. I'll go to court for the eviction and then we'll see what the judge says.*

*Thanks again and talk to you soon.*

**transfer** | Housing 2021/Thomas Morgan Apartments ×

**Thomas Logan**                                                          Mon, Dec 11, 2023, 9:57 AM     ☆
Good morning, Greg, We are working on your transfer...what day would you like to sign your new lease for your new unit? Rosea...

**Greg Marlor** <gmanib6@gmail.com>                          Mon, Dec 11, 2023, 11:59 AM
to Thomas

I'm ready and have been waiting for two years to be placed in a one bedroom so as soon as possible. I will pay the 800.00 for rent I
owe as soon as the new lease is filled out and the transfer is ready.

*Greg Marlor <gmanib6@gmail.com>*

*Thu, Dec 28, 2023, 12:54 PM*

*to Thomas*

*Roseanna,*

*I don't understand what's going on with the transfer to an ADA compliant apartment. It's beyond my comprehension, that management continues to subject me to live in an apartment that is not handicap accessible and has for almost two years.*

*I was approved for a one bedroom at 520 a month and then the housing company denied me housing because of a court case from 2002 out of Madison County.  Renee gave me the county and date. I was suffering from Long Covid, brain fog, and could not cognitively process critical information. For one, why did I not apply for an ADA apartment to begin with. Every appointment I attended was in a wheelchair and when I came and gave my deposit and Renee showed me the studio I was in my wheelchair. I can see the implications of what's to come when I look back now and Renee should have not allowed me to rent an apartment that opened up the door of injury.*

*Now, almost two years later, brain fog has subsided, though far from recovered, and I'm fighting to try to get into an ADA apartment that's is empty?*

*I've reported to you I fell and hurt my back the other day and actually was sick enough to go to the ER. The doctor said I had pulled a muscle in my mid back but primarily focused on my upper respiratory issues. My back was secondary and actually I've recovered from both and attended my father's funeral. I guess what I'm getting at is my falling trying to get into the shower could have turned out to be a lot worse and I can't afford anymore physical problems. Tuesday of this week was the first time I'd been to physical therapy because of Thanksgiving, my back and upper respiratory illnesses, my father's passing, and then Christmas. I've regressed and cannot afford more setbacks.*

*This apartment is not functional and I'm not going to point out the obvious. Yes I'm behind in rent but at anytime I could be caught up and told you I'd pay the 800 dollars I was behind as soon as I signed the lease. All I have to do is call my mom and have the money moved over. I have an overpayment check from Idaho Power that was mailed out last night and will be here tomorrow. It's for a thousand dollars and won't have to involve my mother to get caught up but feel I'm not getting my issues addressed by upper management.*

*Renee told me she was going to get me transferred to a one bedroom and you even pulled the transfer request sheet I filled out that she never turned into management. In fact it was filled out in July 2021 and the date she had on it was October. Then Adam came and I stated the transfer request with him and the third Regional Manager, I believe it was Michelle. She told me and I forwarded all the emails to her, that she'd take care of my transfer to a one bedroom. Adam confirmed there was issues with the application process and me being denied housing that led to me getting placed into this studio. He assured me that he'd get me into a one bedroom and for two months I prepaid to move into a one bedroom and the first came and went and the first came and went, ultimately he packed up and left in the middle of the night leaving me with a new onsite manager, you, and Mindy the new Regional Manager, Mindy.*

*I spoke to you and believe me, this is not in anyway a Roseanna problem from the past, but currently you are the one to resolve my issue. After speaking to you I spoke to Mindy who told me she would keep me informed and asked me to forward all the emails and txt and I never heard back from her. Several calls to the current and departing assets manager finally generated a call back.*

*I thought we had a good talk and after covering the blatant discriminatory treatment I've received for the last almost two years she offered me a one bedroom for 600 and because I knew you and Mindy where supposed to be meeting and didn't want to cause any problems I mentioned that you and Mindy were supposed to have a meeting to discuss a transfer, why don't you get with them to get it all resolved. We ended the call and I don't know that was two months ago.*

*We have talked several times and we know I've been told several dates, the first of next week, then the first of the next week, as soon as this is fixed, as soon as this person is back, Mindy approved your transfer, this person resigned, what day do you want to sign your new lease, to the most resent; we're ready but you make too much money but we are trying to work in it.*

*I have a headache now and this kind of thing throws me into a state of anxiety and more that I will not discuss in email. I now know why I don't leave my apartment and really don't start my day until 6:00 PM.*

18. Marlor has had two more falls getting into the shower. One time first responders responded helped assist him up off the floor and the last time he was suffering from an arthritis flare-up and the fall hurt his back. Worse, his phone was dead and spent the night on the bathroom floor and the next morning maintenance came to check the fire alarms and one of them retrieved his charger and plugged it in for him and asked if they needed to call an

ambulance. Marlor told him that he had his phone charging so he would call if needed. Marlor noticed his phone was not charging correctly so after a few more hours he used the toilet and wheelchair and lifted himself up and was able to finally get into his wheelchair. The fall resulted in a contusion on his backside that took several weeks to heal. Marlor can and has adjusted to the shower issues by supplementing different assisting shower chairs. However, the issues with the shower arose after being sick because he was locked out of the building twice in a weekend. Moreover, the room in a studio bathroom for a wheelchair is not conducive and marks on the walls from his wheelchair rubbing shows a continual struggle.

19. After speaking to Roseann and her informing him he made too much money and they were working on a solution, he received a letter stating that he would not be getting the accessible apartment. Marlor had filed a complaint with HUD back in early 2023 but the investigator was not able to understand that Marlor's discrimination started in 2021 and was on going. Another issue was Marlor's brain fog and processing information and communicating was not well due to Long COVID. However, he finally was able to talk to the supervisor and he submitted another dialog but for some reason they are not understanding what all has transpired because bottom line, Marlor still lives in an apartment that in not accessible and The Housing Company will not address his complaints and in every meaning of the word, has and is breaking his ADA rights in several ways. More, has caused Marlor several injuries and almost his life.

20. Marlor had a young acquaintance that he had known for a year and a half, and she could not have been older than 24 or 25. She would stop by every once and a while because he had told Riley that if she ever needed a place to go that she had a safe place to go. However, on May 24, another tenant had let her in the building, and she knocked at his door and because he had some company already, she primarily stayed in the bathroom until his guest left. She had never acted like she was acting that night. Totally out of character and at one point she would not give Marlor's phone back to him and he told her that he was going to have to call

the cops. After she left the next morning Marlor sent her a message, clearly stating she was not welcome at his place, and she knew why. As Marlor was starting a bath on the 8th of June, Riley again had been let in the building by another resident and walked in wanting to use his phone. He gave her his phone and continued with his bathing, and she came in and out of his apartment fighting with her boyfriend on the phone like always. Over an hour later Marlor came out and she was on the phone in the kitchen, and he proceeded to his bedroom part of his studio apartment. Marlor cannot remember a whole lot, but he knows he does not do fentanyl and if it was not for his neighbor, he would not be alive. His neighbor gave him CPR until the paramedics arrived and gave him Narcan until he regained consciousness.

21. Marlor was released from the hospital on the following Monday and Riley stayed in his apartment and watched his two dogs. He was in severe pain from the CPR but other than that, he was fine. The Doctor told him that he could not remember a patient who had gone through what he had gone through and not be brain dead or lost his life. He informed the doctor that he did not do fentanyl, but he already knew that because Marlor had no withdraw symptoms for an opioid and other than severe chest pain he was okay; what he did not know was the severity of his injury. Monday, the night he was released, Riley left, but she returned the next morning and asked to borrow his phone for a minute and reluctantly he did. That was the last time he saw his phone and Riley and his situation, went from not very good to very bad. He had to remotely wipe his phone, and the situation left no way for St. Lukes' nurses, PT, OT, or for that matter, anyone to contact him; more, he was stranded, and he could not take care of himself. Nobody could call him, and he was physically unable to go let anyone in the building if someone could have contacted by phone. If it was not for his neighbor, he would not have been able to manage, she absolutely aided and assisted him in every aspect of his life. As it was, he only made it a week and had to call the ambulance to take him back to the hospital. He was in so much pain he could not fight through it any longer. The ER doctor ordered an MRI, and the results revealed several rib fractures from CPR, and they had to manage his pain for a week before he was released. With Marlor's injuries to his ribs and his disability it was a very long and painful recovery; Marlor kept to his apartment before his injury but since he rarely leaves.

22. The Housing Company and its officers started discriminating against Marlor when they denied him housing and then took the opportunity, unjustly and improperly, to strip him of his qualified 1 bedroom at $520 and once his denied status was reversed because he supplied them with the date of the charge, they requalified him for a studio at $620. These actions are discriminatory and set Marlor on a path of hardship, difficulty, and have negatively affected him monetarily, physically and mentally. To make matters worse, they lie to him and tell him he is on a waiting list that does not exist. As of today's date, August 7, 2024, from February 15, 2022, when Marlor moved into his studio apartment; a total of 905 days has surpassed and the hardships of living in conditions, where he is reminded of his inequalities and inabilities to function as someone without a disability, is inexcusable and not only has THC stripped him of his independence, it has been a continual physical and psychological battle to live in housing THC has subjected him to live in. Then, at every instance when Marlor tries to get moved into a 1 bedroom that would alleviate his hardship and risks of injury and grant him some independence, at every avenue THC's officers deter, deny, stall, ignore, or acknowledge Marlor's need for anything more than a studio apartment; including that the front door access is a barrier and does not follow Ada regulations and laws.

HUD agreed with the comment that there are many building industry professionals who are involved in the design and construction of multifamily housing covered by the Act (e.g., owners, developers, architects, engineers, construction contractors). Any person or entity involved in the noncompliant design and construction of buildings or facilities subject to the Act's design and construction requirements may be held liable for violations of the Act. This includes a person or entity involved in only the design, only the construction, or both the design and construction of covered multifamily housing. So all such persons should be aware of the requirements.

23. The keycard access to the building entrance is a barrier and THC's officers utilized the same discriminatory antics as denying Marlor an enjoyable place to live. Marlor looks to put blame on the owner of the building and the architect because it starts with them; it is all about cost. If the owner of TLA and the management of THC did not want to allow the residents at TLA to have access to the application because of the cost, then the building should not have been built with a barrier. The system employs a key-card access entry for the residents of TLA but was built to utilize a application entry system. This selective hybrid entry system discriminates against a disabled individual and their visitors, and all residents not allowed access to the mobile application. In fact, by not letting a resident allow their visitors access to the building, other residences are forced to either allow or deny other residents' visitors waiting by the entrance to gain access to the building or are void access altogether; unless the visitor is able to contact the resident, and the resident is physically able to let the visitor in the building. If another resident allows access to the building it defeats the purpose of having a secure access entryway. Further, requiring a resident to physically go let a visitor in is discriminatory and does not allow the resident to screen visitors if other residents are allowing a residents' visitors access to the building. It requires that both the visitor and resident have a phone, service, both phones are charged, and many more qualifiers and scenarios. Access to the building and a resident not being able to manage a known, unknown, or potential visitor after 5:00 PM to 8:00 AM, Monday through Friday, and after 5:00 PM on Friday through Monday at 8:00 AM, is discriminatory in practice and almost cost Marlor his life.

24. Marlor was bedridden after his initial stay in the hospital and his subsequent visit. He was denied medical treatment because medical professionals had no way to contact him to gain access to the building after 5:00 PM nor could any of his friends, unless another resident allowed their access. He was also denied medical treatment when medical professionals could not notify him for access to the building during the weekend and finally on Sunday his neighbor was able to go let the nurse in to visit him. He downloaded an application and was able to use an app phone number but was not physical ability to go let someone in the building. The only difference to the entrance to Thomas Logan and The Lucy is the handicap

button that initiates the automatic door, yet they are allowed the mobile application that visitors can contact a resident to allow remote access to the building. Floor 2, office space rentals, in the Thomas Logan apartment building are also allowed access to the mobile application and allows their visitors to contact them for remote access to the building. When someone rents or buys a home and they unfortunately lose their key or lock themselves out of their home they can call a locksmith, pay the fee, and have access to their home. We do not have that luxury here at the Thomas Logan apartments. We are at the mercy of an on-site manager that comes to work at 6 AM and leaves at 3 PM Monday through Thursday and on Fridays she leaves at noon. Lost key or locked out during the weekend we must depend on other residents entering or leaving the building.

**233 Residential Facilities**

**233.1 General**

Facilities with residential dwelling units shall comply with 233.

Advisory 233.1 General. Section 233 outlines the requirements for residential facilities subject to the Americans with Disabilities Act of 1990. The facilities covered by Section 233, as well as other facilities not covered by this section, may still be subject to other Federal laws such as the Fair Housing Act and Section 504 of the Rehabilitation Act of 1973, as amended. For example, the Fair Housing Act requires that certain residential structures having four or more multi-family dwelling units, regardless of whether they are privately owned or federally assisted, include certain features of accessible and adaptable design according to guidelines established by the U.S. Department of Housing and Urban Development (HUD). These laws and the appropriate regulations should be consulted before proceeding with the design and construction of residential facilities.

Residential facilities containing residential dwelling units provided by entities subject to HUD's Section 504 regulations and residential dwelling units covered by Section 233.3 must comply with the technical and scoping requirements in Chapters 1 through 10 included this document. Section 233 is not a stand-alone section; this section only addresses the minimum number of residential dwelling units within a facility required to comply with Chapter 8. However, residential facilities must also comply with the requirements of this document. For example: Section 206.5.4 requires all doors and doorways providing user passage in residential dwelling units providing mobility features to comply with Section 404; Section 206.7.6 permits platform lifts to be used to connect levels within residential dwelling units providing mobility features; Section 208 provides general scoping for accessible parking and Section 208.2.3.1 specifies the required number of accessible parking spaces for each residential dwelling unit providing mobility features; Section 228.2 requires mail boxes to be within reach ranges when they

serve residential dwelling units providing mobility features; play areas are addressed in Section 240; and swimming pools are addressed in Section 242. There are special provisions applicable to facilities containing residential dwelling units at: Exception 3 to 202.3; Exception to 202.4; 203.8; and Exception 4 to 206.2.3.

### 233.2 Residential Dwelling Units Provided by Entities Subject to HUD Section 504 Regulations

Where facilities with residential dwelling units are provided by entities subject to regulations issued by the Department of Housing and Urban Development (HUD) under Section 504 of the Rehabilitation Act of 1973, as amended, such entities shall provide residential dwelling units with mobility features complying with 809.2 through 809.4 in a number required by the applicable HUD regulations. Residential dwelling units required to provide mobility features complying with 809.2 through 809.4 shall be on an accessible route as required by 206. In addition, such entities shall provide residential dwelling units with communication features complying with 809.5 in a number required by the applicable HUD regulations. Entities subject to 233.2 shall not be required to comply with 233.3.

Advisory 233.2 Residential Dwelling Units Provided by Entities Subject to HUD Section 504 Regulations. Section 233.2 requires that entities subject to HUD's regulations implementing Section 504 of the Rehabilitation Act of 1973, as amended, provide residential dwelling units containing mobility features and residential dwelling units containing communication features complying with these regulations in a number specified in HUD's Section 504 regulations. Further, the residential dwelling units provided must be dispersed according to HUD's Section 504 criteria. In addition, Section 233.2 defers to HUD the specification of criteria by which the technical requirements of this document will apply to alterations of existing facilities subject to HUD's Section 504 regulations.

### 233.3 Residential Dwelling Units Provided by Entities Not Subject to HUD Section 504 Regulations

Facilities with residential dwelling units provided by entities not subject to regulations issued by the Department of Housing and Urban Development (HUD) under Section 504 of the Rehabilitation Act of 1973, as amended, shall comply with 233.3.

### 233.3.1 Minimum Number: New Construction

Newly constructed facilities with residential dwelling units shall comply with 233.3.1.

EXCEPTION: Where facilities contain 15 or fewer residential dwelling units, the requirements of 233.3.1.1 and 233.3.1.2 shall apply to the total number of residential dwelling units that are constructed under a single contract, or are developed as a whole, whether or not located on a common site.

### 233.3.1.1 Residential Dwelling Units with Mobility Features

In facilities with residential dwelling units, at least 5 percent, but no fewer than one unit, of the total number of residential dwelling units shall provide mobility features complying with 809.2 through 809.4 and shall be on an accessible route as required by 206.

### 233.3.1.2 Residential Dwelling Units with Communication Features

In facilities with residential dwelling units, at least 2 percent, but no fewer than one unit, of the total number of residential dwelling units shall provide communication features complying with 809.5.

**809.5.5 Residential Dwelling Unit Primary Entrance**

Communication features shall be provided at the residential dwelling unit primary entrance complying with 809.5.5.

**809.5.5.1 Notification**

A hard-wired electric doorbell shall be provided. A button or switch shall be provided outside the residential dwelling unit primary entrance. Activation of the button or switch shall initiate an audible tone and visible signal within the residential dwelling unit. Where visible doorbell signals are located in sleeping areas, they shall have controls to deactivate the signal.

**Communication Access at Doors**

[§806.3.2]

In addition to requirements for two-way communication systems provided at restricted entrances, the Standards include requirements for communication access in transient lodging and residential facilities:

- visible signals for door bells or knocks are required in transient lodging guest rooms providing communication access (§806.3.2);

- a hard-wired doorbell with visible signals is required at the primary entrance in dwelling units providing communication access, along with a means to visually identify visitors without opening the door, such as a vision panel or peephole (§809.5.5).

**Restricted Entrances**

[§206.4.7]

If entrances are restricted to certain occupants on a controlled basis, at least one must comply in addition to public entrances required to be accessible. This applies to those entrances where entry access is verified by security personnel and is strictly limited to certain occupants, but no one else, including guests or companions of authorized individuals. All other types of entrances, excluding service entrances, are considered "public entrances" under the Standards, including employee-only entrances requiring keys or access cards or codes but that lack the level of security of restricted entrances.

**Two-Way Communication Systems**

[§230] and [§708] Where two-way communication systems are provided to gain entry to a facility or to restricted spaces, they must include visual and audible signals to accommodate people with hearing, speech, or visual impairments. This applies to all entrances equipped with such systems, including those that are inaccessible. Lighted signals should have labels to indicate their meaning. If handsets are

provided, cords must be at least 29" long. Control buttons and other operable parts must comply at those systems located at accessible entrances.

### 809.5.5.1 Notification

A hard-wired electric doorbell shall be provided. A button or switch shall be provided outside the residential dwelling unit primary entrance. Activation of the button or switch shall initiate an audible tone and visible signal within the residential dwelling unit. Where visible doorbell signals are located in sleeping areas, they shall have controls to deactivate the signal.

### 809.5.5.2 Identification

A means for visually identifying a visitor without opening the residential dwelling unit entry door shall be provided and shall allow for a minimum 180 degree range of view.



Title 24 - Housing and Urban Development
PART 8
§ 8.4
(b)(1) A recipient, in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from the Department may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap:
(i) Deny a qualified individual with handicaps the opportunity to participate in, or benefit from, the housing, aid, benefit, or service;
(ii) Afford a qualified individual with handicaps an opportunity to participate in, or benefit from, the housing, aid, benefit, or service that is not equal to that afforded to others;
(iii) Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
(iv) Provide different or separate housing, aid, benefits, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services that are as effective as those provided to others.
(viii) Otherwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit, or service.
(2) For purposes of this part, housing, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for individuals with handicaps

and non-handicapped persons, but must afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement.

(3) A recipient may not deny a qualified individual with handicaps the opportunity to participate in any federally assisted program or activity that is not separate or different despite the existence of permissibly separate or different programs or activities.

(4) In any program or activity receiving Federal financial assistance from the Department, a recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would:

(i) Subject qualified individuals with handicaps to discrimination solely on the basis of handicap;

(ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective of a program or activity; or

(iii) Perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

(5) In determining the site or location of a federally assisted facility, an applicant for assistance or a recipient may not make selections the purpose or effect of which would:

(i) Exclude qualified individuals with handicaps from, deny them the benefits of, or otherwise subject them to discrimination under, any program or activity that receives Federal financial assistance from the Department, or

(ii) Defeat or substantially impair the accomplishment of the objectives of the program or activity with respect to qualified individuals with handicaps.

§ 8.22 New construction—housing facilities.
A unit that is on an accessible route and is adaptable and otherwise in compliance with the standards set forth in § 8.32 is accessible for purposes of this section. An additional two percent of the units (but not less than one unit) in such a project shall be accessible for persons with hearing or vision impairments.

### 809.5.5 Residential Dwelling Unit Primary Entrance

Communication features shall be provided at the residential dwelling unit primary entrance complying with 809.5.5.

**809.5.5.1 Notification** 

A hard-wired electric doorbell shall be provided. A button or switch shall be provided outside the residential dwelling unit primary entrance. Activation of the button or switch shall initiate an audible tone and visible signal within the residential dwelling unit. Where visible doorbell signals are located in sleeping areas, they shall have controls to deactivate the signal.

> Advisory 809.5.5.2 Identification. In doors, peepholes that include prisms clarify the image and should offer a wide-angle view of the hallway or exterior for both standing persons and wheelchair users. Such peepholes can be placed at a standard height and permit a view from several feet from the door.

### 809.5.6 Site, Building, or Floor Entrance

Where a system, including a closed-circuit system, permitting voice communication between a visitor and the occupant of the residential dwelling unit is provided, the system shall comply with 708.4.