**HOUSING DISCRIMINATION CLAIMS**

*Defendants: Thomas Logan Apartment's Owners, Architects, The Housing Company's Assets Manager, Six Regional Managers, Three On-Site Managers, Any and All Employees Associated With Discrimination In This Compliant, Any and All Third Party Participants Who Knew and Did Not Intervene*

I. JURISDICTION

In December 2022, Marlor contacted the Intermountain Fair Housing Council for assistance and after a brief discussion of discriminatory events and a request for the application the call ended. The next day he received an email stating, "You stated your housing provider denied you housing because of your criminal background." She referred him to the Attorney General, and stated his issues were consumer based, and then referred him to the Volunteer Lawyer Program, and she reminded him he had said he had their contact information. In January 2023, Marlor filed a complaint with Housing and Urban Development (HUD) and after waiting several months and no return calls or emails, he called and left several messages and eventually he received calls back. Marlor talked to the specialist, and he said he would reopen the case and that they needed to conduct an intake interview. The next day the specialist's co-worker called and after checking she informed him his case was not open. The specialist called again and asked him if he wanted his case opened and multiple times Marlor inquired, why his case remained closed and the specialist stated, "Do you want me to open it or not." Marlor's issues with the specialist resonated while trying to communicate THC's long-ongoing discrimination and staying within HUD's parameters of one year; the ongoing discrimination originated well beyond the timeline. When giving the specialist a chronological timeline that eventually passed a year, the specialist was adamant about not allowing Marlor to continue to the onset of discrimination. Marlor asked for his supervisor's contact information, and he gave him his name and stated that it was public information, and Marlor ended the phone call.

In January 2024, THC notified Marlor that he made too much money for the accessible apartment and that they were unable to accommodate him, and again denied another transfer request. This denial motivated Marlor to reach out to HUD for assistance again, and contacted the specialist, and was able to obtain the supervisor's contact information. The specialist that Marlor had such a tough time dealing with no longer worked for HUD. Without supplying any documentation about the communication between THC and Marlor, and without any follow up questions to his detailed timeline of events, he received an email stating no action was going to be taken and the reasons why. The last conversation Marlor had with the supervisor was a precursor to HUD's denial for assistance when he stated, "If they make everyone in the apartment complex do it then it's not discrimination."

March 28, 2024, Marlor filled out a questionnaire with Idaho Human Rights Commission to start a complaint against The Housing Company. On August 28, 2024, Marlor received the Certificate of Service by email, and it stated, "Based upon the evidence submitted, we find no probable cause to believe that unlawful disability discrimination has been established. Therefore, pursuant to the Rules of the Idaho Human Rights Commission, this case is dismissed." During this time Marlor contacted Idaho Legal Aid and after going through their financial questionnaire, he was told he qualified, and he had an interview phone call with a lawyer. The lawyer assured Marlor he would get with another lawyer that knew more about housing and contact THC and try to help resolve his issues. Marlor communicated that no legal action could be filed while he has a complaint with the Idaho Human Rights Commission. The lawyer informed Marlor that they do not file lawsuits, that they would contact Logan Apartments to resolve the matter. A week passed and he received an email stating that there was no funding and that they were not going to be able to help.

FACTS OF THIS CASE:

Statements of Discrimination:

Marlor was subjected to discrimination based on his disabilities (paralysis, rheumatoid arthritis, long COVID-19) when The Housing Company, ("THC") denied fair and equal access to federally funded, wheelchair-accessible housing by not giving him an opportunity to dispute charges

found in his background check before adverse action was taken. Marlor received a letter informing him he had been denied housing. The onsite manager gave him enough information that she could have called the county and reversed the denial, but he received the disposition of the case and supplied it to THC. After Marlor supplies the date, and for no logical reason including change of income or in his household composition, they recertify him and subsequently qualify him unit 506, a non-accessible studio apartment at $620 a month when his original certification qualified him for unit 504 at $520, an accessible one-bedroom, fitted with grab bars by the toilet and shower, and the washer dryer were side by side and stationed in a separate room from the bathroom. THC recertified Marlor without any changes in income or family composition, and they placed him on a waiting list even though their application states:

***CHANGES IN INCOME OR FAMILY COMPOSITION FOR WAITING LIST APPLICANTS:** If an Applicant's income changes to an amount which is no longer eligible under the limitations of the assistance program by the time the application reaches the top of the waiting list, written notice will be given advising the Applicant that: (1) they are not presently eligible; (2) the Applicant could become eligible if the household income decreases, the number of household members changes, or the Income Limit changes, and (3) asks whether or not the Applicant wishes to remain on the waiting list.*

Marlor sent the onsite manager an appeal and noting its importance she forwarded it to the regional manager. He answered Marlor's appeal and gave a conflicting 35-year-old case for the reason of the denial. His appeal was not considered because the on-site manager and regional manager would have recognized that the documentation with a case without an associated date, was still needed and never supplied to THC. Further complicating THC's recertification that places Marlor on a waiting list for a one-bedroom, is that the Logan apartment building was not completed until February 2022. Until April 28, 2022, no one lived in unit 504 and is considered "Empty", by Idaho Finance Association. When an apartment is considered "Empty," then it has no associated program attached to it and awaits a qualifying Applicant's certification and move-in. Regardless of the denial of housing and recertification, THC's application states, Applicants with a household member with a disability is given priority and moved to the top of the waiting list, and this alone would have moved Marlor to the top of the list. Even if Marlor's disability did not move him to the top of the list, when he requested a transfer to 504 in July of 2022, Miller

denied him, rented it out to someone else, and then held onto his request and did not upload it until October.

THC contends that, "Logan is a Low-Income Tax Credit ("LIHTC") property developed pursuant to 26 U.S.C. § 42. As such, it has complex regulatory requirements in relation to rental rates, unit availability, and income." The THC also take this position, "…eligibility is based on income limitations required under an applicable LIHTC set-aside test." Then go on to say there are limitations on what Marlor's income can exceed in relation to the relevant Area Median Income ("AMI"). THC finishes with, "The set-aside test Logan uses is irrevocable and was determined pursuant to federal law at the beginning of the project. See U.S.C. § 42(g)(1)." This dismisses THC's reason of Marlor's recertification and makes it apparent why they performed a new certification; it is performed at the beginning and "irrevocable" once determined. THC did not want Marlor to live at Thomas Logan and once he supplied the disposition of the case they alleged had a missing date; they retaliated and took the opportunity to recertify him and give him a non-accessible studio apartment at $620, once determined, it is irrevocable. THC purposely created a scenario that charged him more in rent for a non-accessible studio apartment and a new set-aside test that is irrevocable and relevant AMI, conveniently places him in 50% to 60% range and gives THC the ability to deny him future transfers. However, this was not brought up until he was denied the transfer into an available, fully accessible unit.

THC also contends that they are not required to have a system in place that allows visitors to contact the Logan residence. When they implemented a key-card-entry system to the building, it makes the route inaccessible, and therefore discriminatory by HUD's regulations; there must be an accessible route into the building for someone that is disabled. Nevertheless, THC fails to grant Marlor reasonable accommodation for an accessible one-bedroom and a solution to the current inaccessible entry into the building for him and his visitors. THC's discriminative tactics are found in both their actions and nonactions and resonated in September 2021, when during the application process Marlor's application was denied. Marlor continues to live in a non-accessible studio apartment even though he has communicated to five regional managers, three onsite managers, an assets manager, and sought help from numerous disabilities advocating rights agencies; yet his living conditions have been and continue to be hazardous: up to the filing of this complaint.

In support of these statements, Marlor offers the following.

THE PARTICULARS ARE:

1. Marlor uses a wheelchair because his disability stems from partial paralysis of his legs and rheumatoid arthritis. He also contracted long COVID-19 in 2020, which has significantly affected and continues to affect his cognition. Marlor's inability to articulate THC's strategically implemented and knowledgeable based discrimination is due to Long COVID-19's brain fog and other negative cognitive Long COVID symptoms, that he still suffers from today.

2. The Act defines "handicap" as a physical or mental impairment which substantially limits one or more of such person's major life activities, a record of having such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201

3. The Housing Company produced a legal document that is discriminatory, an application for housing that states, "PROCESSING STEPS" that "Applicants… …who have a criminal background will be notified that they have been removed from the waiting list." Their administrative policy is discriminatory because adverse action is taken before an Applicant is given an opportunity to dispute records that deem him ineligible. THC's policy for when the background check finds issues in someone's financial credit check states, "In the event of decline based upon credit, the Applicant has 14 days to provide an explanation and request further consideration."

4. He applied for an apartment at Logan in September of 2021. Off his application and first interview, his certification qualified him for an accessible one-bedroom apartment and at a minimum, units 504 and 509 were available for $520 per month when he moved in; 504 had accessible grab bars by the toilet and in the shower, and the washer and dryer were placed side by side and in a separate room from the bathroom.

5. However, THC denied Marlor housing because, allegedly, he did not pass the background check because, onsite Manager Renee Miller ("Miller"), said "Case #1-4386 out of Madison County, for possession of controlled substance" had no date associated with it.

6. Marlor believes that Miller could have easily called Madison County and received the information that denied him federally funded housing. Marlor looked on iCourt and took a picture of the only possession case out of Madison County and sent the 20-year-old case to

      Miller. Miller then informed Marlor that she needed the disposition from the courts to put in his file and be in compliance. Marlor did not have any outstanding or recent charges, and he has never been charged with violent criminal or sexual offenses. For this reason, he believes management failed to process his application equally, fairly, and in manner because of my disabilities.

7. THC's denial letter stated he had fourteen days to appeal the decision, and 27 days had passed before they received the original documentation from the courts and his application status was reversed. However, by the time management approved his application as a tenant, more qualified applicants had allegedly moved above him on the list for housing. For this reason, Miller told him his original certification qualifying him for unit 504 for $520 per month was not valid, upon recertification he now qualified for a studio apartment, unit 506, for $620 per month.

8. On December 28, 2021, he appealed the application process because he felt he was unfairly denied an equal chance to rent unit 504 for $520 a month, an accessible unit. He sent the appeal to Miller, and she forwarded it to the Regional Manager Phillip Sylvester ("Sylvester"). Sylvester answered Marlor's appeal and gave a conflicting 35-year-old case as the reason for denial. However, as with Miller, Sylvester could have easily determined the date of the charge and removed it; or at the very least, followed their application and allowed him priority on the Logan list because of his disability. Marlor questions the application list due to the number of applicants at the time he was put back on the list, November 1, 2021; the building was not completed, and he did not move in until February 16, 2022.

9. He believes Sylvester gave misinformation and discriminated against him because unit 504 was accessible with grab bars by the toilet and shower, the washer and dryer were side by side and located in a separate room, and he was told he would be placed on a waiting list and unit 504 was available until April 28, 2022. Idaho Finance Association states that an apartment that has never been lived in is considered "Empty," until a qualifying Applicant moves in, and the unit then attaches the applicants qualifying program.

10. When he completed the housing application, he failed to fill out the "Voluntary Information" section to disclosing his disability. He believes this to be a conscious decision and was made to discuss options with available units and their accessibility. He also believes this is a formality and would have had to be rectified before the application process even started prior to his first certification. Further, he was wheelchair-bound on each occasion that the management and he

met while processing his application to obtain housing. It was clear that he required an accessible apartment.

11. Even though he attended all meetings with the management in his wheelchair, management recertified him for a non-accessible studio apartment in November of 2001, and on February 16, 2022, he moved into and has resided in a non-accessible apartment. When he moved into the studio apartment in his wheelchair, Miller informed him that it would be approximately one year before he would have the chance to move into a one-bedroom, accessible apartment.

12. In July of 2022, his neighbor moved out of the accessible unit 504. However, Miller informed him the cost of the unit was going to be adjusted to the current studio rate of unit 506 at $620 per month; rent would be $739. He asked for original qualifying documents that certified him for a one-bedroom at $520 per month, but Miller said, "…tell you right now they're not going to give you the one bedroom for $520 the remember I told you the one bedroom is now 739 and you would have to see if your income qualify for that amount And not even sure if they're gonna leave and let anybody transfer from a studio to the one bedroom" Even at the higher price Marlor continued with the transfer to an accessible one-bedroom unit, 504.

13. When he tried to turn in the transfer request, Miller told him that someone else was already interested in the apartment, and she rented it out. He later found out that even though he had completed the transfer request form in July of 2022, Miller failed to upload it into the system until October of 2022; therefore, shielding his request from management and nullifying any waiting list he was on. Further, he spoke to his neighbor right before he left and asked him when he applied for 504, he said April 25th and was accepted the 28th. Meaning, there was no waiting list and therefore no applicants moved above him; the recertification was only utilized to take away his original qualifying one-bedroom and charge more money for a non-accessible studio apartment. Once an Applicant certifies, the qualifying amount only increases and or adjusted when rent is raised. Meaning, when THC discarded his original certification and recertified him, they illegally discriminated against him by instituting less an apartment at a higher cost; ultimately, took away an accessible one-bedroom and charged more for a non-accessible studio.

14. He filed a complaint with the Intermountain Fair Housing Council on December 15, 2022, and he was referred to the State Attorney General's Office and Volunteers Lawyers of Idaho. His complaint was not investigated because he stated that his background check found a charge without a date associated with it. However, the fact that there were contradicting cases, and he had appealed the application process, and his appeal was not considered by the on-site and

regional managers, should have been enough for an investigation. Further, the fact that he was put on a list that did not exist, and THC cannot say that there was no apartment available when there was in fact an available apartment. He received an email stating that they would not be taking on his case and Marlor could not communicate all the issues or provide proof of THC ongoing discrimination; including his attempts to communicate Thomas Logan apartment does not have an accessible route.

15. Shortly after moving in on February 15, 2022, THC implemented a key card entry that requires all visitors to call and let a resident know when they arrived and needed in. Further, for a visitor to gain access to the building it requires Marlor to physically go to let them in; if Marlor is unable to go let a visitor in, another resident lets them in, or they are not allowed to visit. Not only does this require a visitor to have the residence's phone number, but it also requires both the residents and visitors to have charged and functional phones. If these parameters are not met the guest has no way to contact a resident. This is discriminatory for both the visitors and residents.

16. HUD's regulations require an accessible route to include a doorbell outside the main entrance for a visitor to alert the residents. This system of design at Thomas Logan makes his home much more non-accessible for his guests and himself. Marlor contacted on-site managers, regional managers, and the asset manager, and communicated that the front door and the locking system are barriers, but management ignores his complaints. No changes or requests for accommodation have been made in consideration of my disabilities.

17. The front door is locked from 5:00pm to 8:00am on weekdays and all weekend. This is an additional accessibility issue for Marlor. If he loses his keycard, he might be locked out for a long period of time. If he was in a different housing situation, he would be able to call a locksmith and have a key made. Not at Logan, that is, if he was just locked out of his apartment, then he could hire a locksmith to make a key. He has requested a solution to this problem, but THC ignores his requests for reasonable accommodation for both a transfer to an accessible one-bedroom and a solution to the key card entry into the building.

18. The Lucey and Thomas Logan's office rentals on the 2nd floor have access to an application that unlocks the doors and gives their guests access to both sister buildings. The architect personally informed Marlor that both buildings were designed to utilize an application, but on-site managers have communicated each resident that utilizes the application is charged and the owner of the building will not pay for the additional costs for residence of Logan.

19. In November of 2022, Marlor had sent an email to the regional manager but after getting no response he called THC's front office and said Logan had a new regional manager, the previous one had accepted another position within the company. After leaving Kim [LNU] a message she called him and requested all the texts and email communication he had with the onsite and regional managers and offered to work with him and allow him to transfer to an accessible one-bedroom; Adam was asked to pull his file and the three of them would get together. When the first of the month came, Adam would tell Marlor that the transfer would happen, but it would have to wait until the first of the month, and then the first would come, and he would get told the same thing, the first of the month.

20. THC's management kept changing and Adam left in the middle of the night, before he could complete Marlor's transfer to a one-bedroom. Adam's last memo that stated, "Access to the building will be 24/7 key card access only." The memo prompted Marlor to call Kim and when she did not answer he asked for any available regional manager and spoke to Logan's next regional manager, Mindy. She stated that she would talk with Kim and keep him informed. He spoke to Mindy one more time and she said that she was busy with a project and would read his emails and return his call on Friday, he never spoke to her again.

21. Roseanna Dean ("Dean") became his new onsite manager in April of 2023. Marlor informed her about access to the building and the door being a barrier; visitors not being able to contact the residence, discriminates against both the visitor and resident. He asked her to research the door issues and even sent her ADA regulations showing there must be a way for visitors to contact residents via a doorbell outside the main entrance, that allows the visitors to alert the residents. When Marlor informed her that access to the building was a barrier, she stated, "According to you."

22. In July of 2023, Dean informed him that he was number five on the list to move into a one-bedroom with accessible grab bars; Mindy had approved the transfer. Dean eventually offered him a one-bedroom, 504 and informed him that rent would be $879 per month. At first, he agreed to this, but he later decided it was too expensive; especially when he was certified for the one-bedroom, 504 at $540 – plus at that time there would have been a $20 rent increase and would be considered a reasonable accommodation. He turned down the opportunity because he thought at the most, he should transfer at the current rent rate. They were not transferring him from a studio to an accessible one-bedroom because of reasonable accommodation.

23. Less than one month later, he found out a fully accessible apartment was becoming available, and Dean told him he could have it after repairs were complete. Dean finally emailed him back about this apartment on November 28, 2023, to ask if he was still interested in transferring. He replied, "Yes, I've been waiting almost two years." but he did not hear back from her.

24. He emailed Regional Managers Sylvester, Erika Zappa, Kim [LNU], and Mindy [LNU] about his ongoing discrimination and that the onset was when he was denied housing. He communicated that he was originally certified for a one-bedroom but because of conflicting cases, he was recertified for a non-accessible studio, but he never received a response. Marlor believes these tactics are utilized by THCs' regional managers because if they do not acknowledge his discrimination or requests for reasonable accommodation, then he would seek help and would be denied because the use of an applicant's criminal history is not considered discrimination.

25. When Marlor seeks help from disability advocating rights agencies they shield THC and owners from being held accountable. It is obvious Marlor lives and has lived in a non-accessible unit but cannot get an agency to understand that his housing situation is hazardous and has caused injuries; he struggles every day to live in an apartment he should have never been placed in. The Idaho Finance Association and HUD created THC and Marlor feels this has created relationship between the three agencies and shows bias and alienates him from seeking resolve. Further, it gives THC a predisposed disposition that they do not have to follow federal and state regulations, statues, and or laws and do not have to adhere to HUD's administrative regulations. Logan is tax-credit based and THC did not have to receive HUD's certification like a Public Housing Authority complex; however, in HUD's handbook it is highly suggested they know and fallow all regulations and laws because they can be held civilly liable for discrimination.

26. After leaving several messages with the Assets Manager Jennifer Rogers, she called him back and she offered him a one-bedroom unit for $600 per month. Mindy and Miller had plans to meet, and not wanting to cause friction between managers, he informed Jennifer of the planned meeting and asked that the three of them come to some kind of consensus.

27. He cannot use the stacked washer and dryer that are located behind the door in the bathroom; the circumference makes them inaccessible. The hall, fridge, and the layout of the bathroom do not meet the strict measurements set by HUD's regulations, and the toilet and bathtub do not have grab bars.

28. After falling multiple times while attempting to use the shower chair and toilet, Marlor resorted to only taking birdbaths. It was too dangerous to try to shower where there are no grab bars,

and it is not set up for someone in a wheelchair. After one of the falls, he spent a night on the floor and his phone was dead. Maintenance came to check the fire alarms and retrieved his charger for him but shortly after they left, he noticed his phone was not charging. Using his wheelchair and the toilet he was able to get back into his wheelchair.

29. In mid-December, Dean asked Marlor what day he wanted to sign the lease. He replied, "As soon as possible," but again, he did not hear back from her. Then toward the end of December, Dean informed him that he made too much money to qualify for the lease he planned to sign. She added, Thomas Logan would continue working on it.

30. He did not pay his rent in December of 2023 and stated that he would pay rent as soon as the transfer was completed. All he needed was to have the money transferred into his account, and in fact in January of 2024, he paid $1000, and that amount should have covered January 2024 and half of what he was behind from October 2023. Marlor received an email that he would not be able to transfer to the open accessible unit, he made too much money.

31. He had asked for reasonable accommodation to be transferred from three different on-site managers, five regional managers; and their boss, the assets manager, and he still resides in a non-accessible studio apartment. THC purposely denied him federally assisted housing, and purposely said the cause was due to the results of Marlor's background check. They knew the results of an Applicant's background check as a reason to deny a person's housing is not considered discrimination.

32. Marlor has also had issues when the building loses power, the only elevator stops working and he has no access to leave the 5th floor. Marlor is suspicious how the Thomas Logan building passed Boise City's inspection because he knows for a fact the backup generator was not installed for several months after moving in. The elevator does not work when the power goes out and the generator supplying power to both sister buildings could be an issue; nevertheless, the only elevator not working when the power is out discriminates against Marlor's disability.

33. There is a handicap accessible parking spot behind Lucey apartments and his friend received a ticket from a private enforcement parking company, even though Marlor's placard was properly placed on the rearview mirror. Marlor was successful in having the ticket dismissed but not because of federal Public Law 101-336, Americans with Disabilities act of 1990; it was dismissed due to no other tickets being issued on the car's license plate. The law allows anyone who has a disability and is displaying a disability placard or license plate to park in any public, assessable, and designated handicap spot. Marlor tried to explain the statute, but she insisted that the car

351 needs to display a Lucey sticker, and required placard or license plate, to be parked in that
352 handicap spot. This is just another example of the owner of the building discriminating against
353 people with disabilities. If a person is disabled and displays a lawful handicap placard or license
354 plate, but does not have sticker for the Lucey apartments, they can receive a ticket and risk
355 being towed.
356
357 The Continuation of Discrimination.
358
359 In January 2024 HUD reopened Marlor's complaint and after having a brief overview with the
360 supervisor he was under the impression he would finally get some help. He had a lengthy phone
361 call with the intake specialist, but for her to fully understand how THCs were systematically and
362 continually discriminating against Marlor, she would have to first recognize that he was denied
363 housing, not because of his background check, but because THC did not want him in the Logan.
364 That feat was discrimination, but also, the discrimination issued when they retaliated against
365 him and made his rent higher so they could deny him future one-bedrooms. However, the
366 specialist would not go to the origins, so she was unable to recognize and Marlor believes the
367 relationship between THC and HUD is bias; no matter how Marlor is living and has lived in a non-
368 accessible studio and to look past his hazardous living.
369
370 THC manages over 50 property complexes and are experienced and knowledgeable in all aspects
371 including keeping Marlor paying more for less and in addition renting out his qualifying one-
372 bedroom. HUD and Idaho Finance Association established THC and Marlor believes this
373 relationship allows them to employ the tactics utilized to deny him housing and then recertify
374 him and qualify him with a new base rent amount that gives them ability to deny him transfers
375 because of his income. In short, it allows them to operate and seem to be incompliance while
376 discriminating against Marlor. It takes a knowledgeable and experienced company to circumvent
377 applicable governing laws and regulations while maintaining a persona they are complying;
378 especially when facing complaints of discrimination. THC denied Marlor housing and established
379 a new qualifying irreversible base rent for a non-accessible studio apartment. Then at every
380 opportunity they stalled, denied, changed management, ignored, did not honor waiting lists or
381 fulfill approved transfers; and when he sought help through advocating disability agencies,
382 THC's long and established relationships prevailed. Marlor tried HUD, Intermountain Fair

Housing Commission, Idaho Legal Aid, ACLU, and other disability rights advocating agencies in holding THC accountable; they all denied representing him. HUD's reason for not taking further action was based on these factors:

   a. The alleged discrimination based on disability is non-jurisdictional because you did not articulate that the housing provider denied the one-bedroom apartment for $520 and rented the studio for $620 a month because of your protected class, disability. Even if you would state that the denial to rent by the housing provider was due to the protected class. More than one year from the date of the alleged violations has elapsed and this office cannot take any action on your allegations.

   b. You stated that you did not submit reasonable accommodation for a handicap unit due to your disability.

   c. Since you did not request reasonable accommodation for an exception to the property management's new policy for access of the building due to your disability, the alleged discrimination based on disability is non-jurisdictional because the new policy applied to all residents in the building.

   d. Since the property where you reside is not federally funded and not a public entity, HUD cannot enforce ADA.

THC's application depicts a knowledgeable and experienced company in the management of properties. Currently THC manages over 50 properties and processes and certifies hundreds of applicants each year and their experience manifests while processing Marlor's application; however, their intentions were not in Marlor's best interests. From the onset THC's managers cleared a path for housing but the path led to any housing but the Logan; they denied him. For THC to deny Marlor housing and then take the position it was because his background check found a case without an associated date, at first, seemed plausible. However, when one takes their history, experience, knowledge, and start analyzing the information they possessed when they denied Marlor, their story and or proffered reason to deny him housing does not add up. The procedures and policies found in THC's application were not followed while processing Marlor's application. He was not treated equally or fairly and THC's managers cannot say that mistakes were made because discrimination against Marlor was found from the beginning when they denied him housing, then performing the set-aside test again to recertify him for a non-accessible studio apartment, recertifying him gave him a higher rent amount and made it so he would not qualify for transfers and that is if he tried to file discrimination charges they could readily take the position he made too much money. THC did not place him on the list for Logan and if the list existed it did not represent the accessible one-

bedroom, unit 504, that was available until April 2022. The discrimination continues as Marlor's efforts to transfer for the next three years never came to fruition for a variety of reasons. Even though regional managers approved Marlor's transfers, and he emailed all the regional managers the text messages and email communication they requested and not once did they respond. THC application states the following:

> *NON-DISCRIMINATION: The management agent shall comply with all federal, state and local fair housing and civil rights laws and with all equal opportunity requirements as required by law, including without limitation HUD administrative procedures. Federal laws forbid discrimination based on race, color, creed, religion, sex, age, disability, familial status, or national origin. Discrimination against a particular social or economic class is also prohibited (for example: welfare recipients; single parent households, etc.) These requirements apply to all aspects of tenant relations including without limitation: accepting and processing applications, selecting residents from among eligible Applicants on the waiting list, assigning units, certifying and re-certifying eligibility for assistance, granting accommodation and terminating tenancies*

THC's onsite managers, regional managers, assets managers, program coordinators, architects, and owner; are all liable, more for some and less for others, but none the less they are responsible for the discrimination against Marlor's disabilities at that continued from when he filled out THC's application for the Logan in 2021, until the end of the 2024 year.

The Idaho Human Rights Commission (IHRC) reviewed Marlor's complaints Against THC and found that no violations of discrimination had occurred. Marlor believes the IHRC found several violations but because of the relationship between THC and the HRC, the investigation's conclusion was heavily biased. They start of quoting THC's response to Marlor's complaint, "There are a finite and limited number of low-income apartments available in the complex, as well as a finite and limited number of accessible dwelling units that are also low income." Problem with THC and the IHRC using this statement even though it may be true, Marlor points out that there was no need to recertify him and give him a higher base rent and take away his original accessible one-bedroom; thus, making him ineligible and easier for them to deny him future transfers. Further and more damning, they say no apartments were available when 504 was available until April 2022 and Marlor was on the waiting list for a one-bedroom; plus when he was told he lost his original classifying one-bedroom and rent amount, the construction on the Logan was not completed and there was no list. The IHRC changes Marlor's timeline to say that he was denied a transfer to 504 because his transfer was not processed, and THC had already rented it out. This

is just one example of IHRC turning a blind eye to the many acts of THC's discrimination found in Marlor's complaint and then changing his dialog in their denial letter to assimilate no discrimination. Marlor supplied his

Regulations Violated

1. A person is directly liable for:
    A. The person's own conduct that results in a discriminatory housing practice.
    B. Failing to take prompt action to correct and end a discriminatory housing practice by that person's employee or agent, where the person knew or should have known of the discriminatory conduct.
    C. Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party. 24 CFR 100.7(a)(1)(i), 24 CFR 100.7(a)(1), 24 CFR 100.7(a)(1)(ii), 24 CFR 100.7(a)(1)(iii)

2. Vicarious liability. A person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law. 24 CFR 8.4(b)(1)(i)
3. Deny a qualified individual with handicaps the opportunity to participate in, or benefit from, the housing, aid, benefit, or service; 24 CFR 8.4(b)(1)(ii)
4. Afford a qualified individual with handicaps an opportunity to participate in, or benefit from, the housing, aid, benefit, or service that is not equal to that afforded to others; 24 CFR 8.4(b)(1)(iii)
5. Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. 24 CFR 8.4(b)(1)(iv)
6. Provide different or separate housing, aid, benefits, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is

necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services that are as effective as those provided to others.
24 CFR 8.4(b)(1)(v)

7. Aid or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's federally assisted program or activity; 24 CFR 8.4(b)(1)(vii)

8. Deny a dwelling to an otherwise qualified buyer or renter because of a handicap of that buyer or renter or a person residing in or intending and eligible to reside in that dwelling after it is sold, rented or made available; 24 CFR 8.4(b)(1)(viii)

9. Otherwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit, or service. 24 CFR 8.21(a)

10. New construction. New non-housing facilities shall be designed and constructed to be readily accessible to and usable by individuals with handicaps. 24 CFR 8.22(a)

11. New multifamily housing projects (including public housing and Indian housing projects as required by § 8.25) shall be designed and constructed to be readily accessible to and usable by individuals with handicaps. 24 CFR 8.27(a)

12. Owners and managers of multifamily housing projects having accessible units shall adopt suitable means to assure that information regarding the availability of accessible units reaches eligible individuals with handicaps, and shall take reasonable nondiscriminatory steps to maximize the utilization of such units by eligible individuals whose disability requires the accessibility features of the particular unit. To this end, when an accessible unit becomes vacant, the owner or manager before offering such units to a non-handicapped applicant shall offer such unit: 24 CFR 8.27(a)(1)
    a. First, to a current occupant of another unit of the same project, or comparable projects under common control, having handicaps requiring the accessibility features of the vacant unit and occupying a unit not having such features, or, if no such occupant exists, then 24 CFR 8.27(a)(2)
    b. Second, to an eligible qualified applicant on the waiting list having a handicap requiring the accessibility features of the vacant unit. 24 CFR 100.50(b)(1)

13. Refuse to sell or rent a dwelling after a bona fide offer has been made, or to refuse to negotiate for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin, or to discriminate in the sale or rental of a dwelling because of handicap.
24 CFR 100.50(b)(2)

14. Discriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with sales or rentals, because of race, color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.50(b)(3)

15. Engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.50(b)(4)

16. Make, print or publish, or cause to be made, printed or published, any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation or discrimination.
24  FR 100.50(b)(5)

17. Represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that a dwelling is not available for sale or rental when such dwelling is in fact available. 24 CFR 100.60(a)
    - …… or to discriminate against any person in the sale or rental of a dwelling because of handicap. 24 CFR 100.60(b)(1)
    - Failing to accept or consider a *bona fide* offer because of race, color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.60(b)(2)

18. Refusing to sell or rent a dwelling to, or to negotiate for the sale or rental of a dwelling with, any person because of race, color, religion, sex, familial status, or national origin.
24 CFR 100.60(b)(3)

19. Imposing different sales prices or rental charges for the sale or rental of a dwelling upon any person because of race, color, religion, sex, handicap, familial status, or national origin.
24 CFR 100.60(b)(4)

20. Using different qualification criteria or applications, or sale or rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of race, color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.60(b)(6)

552  21. Conditioning the availability of a dwelling, including the price, qualification criteria, or standards
553      or procedures for securing the dwelling, on a person's response to harassment because of race,
554      color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.65(a)
555  22. It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national
556      origin, to impose different terms, conditions or privileges relating to the sale or rental of a
557      dwelling or to deny or limit services or facilities in connection with the sale or rental of a
558      dwelling. 24 CFR 100.65(b)(4)
559  23. Limiting the use of privileges, services or facilities associated with a dwelling because of race,
560      color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person
561      associated with him or her. 24 CFR 100.80(a)
562  24. It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national
563      origin, to provide inaccurate or untrue information about the availability of dwellings for sale or
564      rental. 24 CFR 100.80(b)(1)
565  25. Indicating through words or conduct that a dwelling which is available for inspection, sale, or
566      rental has been sold or rented, because of race, color, religion, sex, handicap, familial status, or
567      national origin. 24 CFR 100.80(b)(5)
568  26. It shall be unlawful to discriminate in the sale or rental, or to otherwise make unavailable or
569      deny, a dwelling to any buyer or renter because of a handicap of-
570      That buyer or renter; 24 CFR 100.202(a)(2)
571  27. A person residing in or intending to reside in that dwelling after it is so sold, rented, or made
572      available; 24 CFR 100.202(b)
573  28. It shall be unlawful to discriminate against any person in the terms, conditions, or privileges of
574      the sale or rental of a dwelling, or in the provision of services or facilities in connection with
575      such dwelling, because of a handicap of—That buyer or renter; 24 CFR 100.202(b)(2)
576  29. A person residing in or intending to reside in that dwelling after it is so sold, rented, or made
577      available; 24 CFR 100.204(a)
578  30. It shall be unlawful for any person to refuse to make reasonable accommodations in rules,
579      policies, practices, or services, when such accommodations may be necessary to afford a
580      handicapped person equal opportunity to use and enjoy a dwelling unit, including public and
581      common use areas. 24 CFR 100.205(a)
582  31. Covered multifamily dwellings for first occupancy after March 13, 1991 shall be designed and
583      constructed to have at least one building entrance on an accessible route unless it is impractical

to do so because of the terrain or unusual characteristics of the site. For purposes of this section, a covered multifamily dwelling shall be deemed to be designed and constructed for first occupancy on or before March 13, 1991, if the dwelling is occupied by that date, or if the last building permit or renewal thereof for the dwelling is issued by a State, County or local government on or before June 15, 1990. The burden of establishing impracticality because of terrain or unusual site characteristics is on the person or persons who designed or constructed the housing facility. 24 CFR 100.205(c)(1)

32. All covered multifamily dwellings for first occupancy after March 13, 1991 with a building entrance on an accessible route shall be designed and constructed in such a manner that—
The public and common use areas are readily accessible to and usable by handicapped persons; 24 CFR 100.600(a)(2)

33. Hostile environment harassment. Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or the provision or enjoyment of services or facilities in connection therewith; or the availability, terms, or conditions of a residential real estate-related transaction. Hostile environment harassment does not require a change in the economic benefits, terms, or conditions of the dwelling or housing-related services or facilities, or of the residential real-estate transaction. 80 FR 63724.