U.S. COURTS

APR 1 4 2025

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

1

2            **HOUSING DISCRIMINATION CLAIMS**

3    *Defendants: Thomas Logan Apartment's Owners, Architects, The Housing Company's Assets*

4    *Managers, Eight Regional Managers, On-Site Managers, ADA Compliance Officer, Any and All*

5    *Employees Associated with Discrimination in This Compliant, Any and All Third-Party*

6    *Participants Who Knew and had the Power but did not Intervene: Idaho Human Rights*

7    *Commission, HUD, Intermountain Fair Housing Commission, Idaho Legal Aid*

8

9

10   I. JURISDICTION

11       In December 2022, Marlor contacted the Intermountain Fair Housing Council for assistance and

12       after a lengthy discussion of discriminatory events and a request for the application the call

13       ended. The next day he received a call and the specialist informed Marlor that she had spoken

14       to IFHC's legal team and determined that his case was "consumer bases" and that they would be

15       closing his compliant. Shortly after the phone call Marlor received an email stating, "You stated

16       your housing provider denied you housing because of your criminal background." She referred

17       him to the Attorney General, and stated his issues were consumer based, and then referred him

18       to the Volunteer Lawyer Program, and she reminded him he had said he had their contact

19       information.

20

21       In January 2023, Marlor filed a complaint with Housing and Urban Development (HUD) and after

22       waiting several months and no return calls or emails, he called and left several messages and

23       eventually he received calls back. Marlor talked to the specialist, and he said he would reopen

24       the case and that they needed to conduct an intake interview. The next day the specialist's co-

25       worker called and after checking she informed him his case was not open. The specialist called

26       again and asked him if he wanted his case opened and multiple times Marlor inquired, why his

27       case remained closed and the specialist stated, "Do you want me to open it or not." Marlor's

28       issues with the specialist resonated with him not reopening his case and further deteriorated

29       while trying to communicate THC's long-ongoing discrimination and staying within HUD's

30  parameters of one year; the ongoing discrimination originated well beyond the timeline. When
31  giving the specialist a chronological timeline that eventually passed a year, the specialist was
32  adamant about not allowing Marlor to continue to the onset of discrimination. Marlor asked for
33  his supervisor's contact information, and he gave him his name and stated that it was public
34  information, and Marlor ended the phone call.
35
36  In January 2024, THC notified Marlor that he made too much money for the accessible
37  apartment and that they were unable to accommodate him and again denied another transfer
38  request. This denial motivated Marlor to reach out to HUD for assistance again, and contacted
39  the specialist, and was able to obtain the supervisor's contact information. The specialist that
40  Marlor had such a tough time dealing with no longer worked for HUD. Without supplying any
41  documentation about the communication between THC and Marlor, and without any follow up
42  questions to his detailed timeline of events, he received an email stating no action was going to
43  be taken and the reasons why. The last conversation Marlor had with the supervisor was a
44  precursor to HUD's denial for assistance when he stated, "If they make everyone in the
45  apartment complex do it, then it's not discrimination."
46
47  March 28, 2024, Marlor filled out a questionnaire with Idaho Human Rights Commission to start
48  a complaint against The Housing Company. On August 28, 2024, Marlor received the Certificate
49  of Service by email, and it stated, "Based upon the evidence submitted, we find no probable
50  cause to believe that unlawful disability discrimination has been established. Therefore,
51  pursuant to the Rules of the Idaho Human Rights Commission, this case is dismissed." During
52  this time Marlor contacted Idaho Legal Aid and after going through their financial questionnaire,
53  he was told he qualified, and he had an interview phone call with a lawyer. The lawyer assured
54  Marlor he would get with another lawyer that knew more about housing and contact THC and
55  try to help resolve his issues. Marlor communicated that no legal action could be filed while he
56  has a complaint with the Idaho Human Rights Commission. The lawyer informed Marlor that
57  they do not file lawsuits, that they would contact Logan Apartments to resolve the matter. A
58  week passed and he received an email stating that there was no funding and that they were not
59  going to be able to help.
60
61

62
63
64
65     FACTS OF THIS CASE:
66     Statements of Discrimination:
67
68          Marlor was subjected to discrimination based on his disabilities (paralysis, rheumatoid arthritis,
69          long COVID-19) when The Housing Company, ("THC") denied fair and equal access to federally
70          funded, wheelchair-accessible housing by not giving him an opportunity to dispute charges
71          found in his background check before adverse action was taken. Marlor received a letter
72          informing him he had been denied housing. The onsite manager gave him enough information
73          that she could have called the county and reversed the denial, but he received the disposition of
74          the case and supplied it to THC. After Marlor supplies the date, and for no logical reason
75          including change of income or household composition, they recertified him and subsequently
76          qualified him for unit 506, a non-accessible studio apartment at $620 a month. His original
77          certification qualified him for unit 504 at $520, an accessible one-bedroom, fitted with grab bars
78          by the toilet and shower, and the washer dryer were side by side and stationed in a separate
79          room from the bathroom. THC recertified Marlor without any changes in income or family
80          composition, and they placed him on a waiting list even though their application states:
81
82          ***CHANGES IN INCOME OR FAMILY COMPOSITION FOR WAITING LIST APPLICANTS:*** *If an*
83          *Applicant's income changes to an amount which is no longer eligible under the*
84          *limitations of the assistance program by the time the application reaches the top of the*
85          *waiting list, written notice will be given advising the Applicant that: (1) they are not*
86          *presently eligible; (2) the Applicant could become eligible if the household income*
87          *decreases, the number of household members changes, or the Income Limit changes,*
88          *and (3) asks whether or not the Applicant wishes to remain on the waiting list.*
89
90
91          Marlor sent the onsite manager an appeal and noting its importance she forwarded it to the
92          regional manager. He answered Marlor's appeal and gave a conflicting 35-year-old case for the
93          reason of the denial. His appeal was not considered because the on-site manager and regional
94          manager would have recognized that the documentation with a case without an associated
95          date, was still needed and never supplied to THC. Further complicating THC's recertification that

96      places Marlor on a waiting list for a one-bedroom, is that the Logan apartment building was not

97      completed until February 2022. Until April 28, 2022, no one lived in unit 504 and is considered

98      "Empty", by Idaho Finance Association. When an apartment is considered "Empty," then it has

99      no associated program attached to it and awaits a qualifying Applicant's certification and move-

100     in. Regardless of the denial of housing and recertification, THC's application states, Applicants

101     with a household member with a disability are given priority and moved to the top of the

102     waiting list, and this alone would have moved Marlor to the top of the list. Even if Marlor's

103     disability did not move him to the top of the list, when he requested a transfer to 504 in July of

104     2022, Miller denied him, rented it out to someone else, and then held onto his request and did

105     not upload it until October.

106

107     THC contends that, "Logan is a Low-Income Tax Credit ("LIHTC") property developed pursuant to

108     26 U.S.C. § 42. As such, it has complex regulatory requirements in relation to rental rates, unit

109     availability, and income." The THC also take this position, "...eligibility is based on income

110     limitations required under an applicable LIHTC set-aside test." Then go on to say there are

111     limitations on what Marlor's income can exceed in relation to the relevant Area Median Income

112     ("AMI"). THC finishes with, "The set-aside test Logan uses is irrevocable and was determined

113     pursuant to federal law at the beginning of the project. See U.S.C. § 42(g)(1)." This dismisses

114     THC's reason of Marlor's recertification and makes it apparent why they performed a new

115     certification; it is performed at the beginning and "irrevocable" once determined. THC did not

116     want Marlor to live at Thomas Logan and once he supplied the disposition of the case they

117     alleged had a missing date; they retaliated and took the opportunity to recertify him and give

118     him a non-accessible studio apartment at $620, once determined, it is irrevocable. However, in

119     Marlor's case, they contradict their statement and recertified him. THC purposely created a

120     scenario that charged him more in rent for a non-accessible studio apartment and a new set-

121     aside test that is irrevocable and relevant AMI, conveniently places him in 50% to 60% range and

122     gives THC the ability to deny him future transfers. Conveniently, this was not brought up until he

123     was denied the transfer into an available, fully accessible unit; November-December 2023. Even

124     then, he was only told he made too much money.

125

126     THC also contends that they are not required to have a system in place that allows visitors to

127     contact the Logan residence. When they implemented a key-card-entry system to the building in

128    March 2022, it makes the route inaccessible, and therefore discriminatory by HUD's regulations;

129    there must be an accessible route into the building for someone that is disabled. Nevertheless,

130    THC fails to grant Marlor reasonable accommodation for an accessible one-bedroom and a

131    solution to the current inaccessible entry into the building for him and his visitors. THC's

132    discriminative tactics are found in both their actions and nonactions and resonated in

133    September 2021, when during the application process Marlor's application was denied. Marlor

134    continues to live in a non-accessible studio apartment even though he has communicated to six

135    regional managers, three onsite managers, an assets manager, and sought help from numerous

136    disabilities advocating rights agencies; yet his living conditions have been and continue to be

137    hazardous: up to the filing of this complaint.

138

139

140    THE PARTICULARS ARE:

141    In support of these statements, Marlor offers the following.

142

143    1.    Marlor uses a wheelchair because his disability stems from partial paralysis of his legs and

144    rheumatoid arthritis. He also contracted long COVID-19 in 2020, which has significantly affected

145    and continues to affect his cognition. Marlor's inability to articulate THC's strategically

146    implemented and knowledgeable based discrimination is due to Long COVID-19's brain fog and

147    other negative cognitive Long COVID symptoms, that he still suffers from today.

148    2.    The Act defines "handicap" as a physical or mental impairment which substantially

149    limits one or more of such person's major life activities, a record of having such an

150    impairment, or being regarded as having such an impairment. 42 U.S.C. § 3602(h); 24

151    C.F.R. § 100.201

152    3.    The Housing Company produced a legal document that is discriminatory, an application for

153    housing that states, "PROCESSING STEPS" that "Applicants... ...who have a criminal background

154    will be notified that they have been removed from the waiting list." Their administrative policy is

155    discriminatory because adverse action is taken before an Applicant is given an opportunity to

156    dispute criminal records that deem him ineligible. THC's policy for when the background check

157    finds issues in someone's financial credit check states, "In the event of decline based upon

158    credit, the Applicant has 14 days to provide an explanation and request further consideration."

4. He applied for an apartment at Logan in September of 2021. Off his application and first interview, his certification qualified him for an accessible one-bedroom apartment and at a minimum, units 504 and 509 were available for $520 per month when he moved in; 504 had accessible grab bars by the toilet and in the shower, and the washer and dryer were placed side by side and in a separate room from the bathroom.

5. However, THC denied Marlor housing because, allegedly, he did not pass the background check because, onsite Manager Renee Miller ("Miller"), said "Case #1-4386 out of Madison County, for possession of controlled substance" had no date associated with it.

6. Marlor believes that Miller could have easily called Madison County and received the information that denied him federally funded housing. Marlor researched iCourt and took a snapshot of the only possession case out of Madison County and sent the 20-year-old case to Miller. Miller then informed Marlor to be in compliance, she needed the disposition from the courts to put in his file. Marlor did not have any outstanding or recent charges, and he has never been charged with violent criminal or sexual offense. For this reason, he believes management failed to process his application equally, fairly, and in manner because of his disabilities.

7. THC's denial letter stated he had fourteen days to appeal the decision, and 27 days had passed before they received the original documentation from the courts and his application status was reversed. However, THC alleges, by the time management approved his application as a tenant, more qualified applicants had moved above him on the list for housing. For this reason, Miller told him his original certification qualifying him for a one-bedroom, unit 504, for $520 per month was not valid; upon recertification he now qualified for a studio apartment, unit 506, for $620 per month.

8. On December 28, 2021, he appealed to their application process because he felt he was unfairly denied an equal chance to rent, unit 504, for $520 a month, an accessible unit. He sent the appeal to Miller, and she forwarded it to the Regional Manager Phillip Sylvester ("Sylvester"). Sylvester answered Marlor's appeal and gave a conflicting 35-year-old case, for the reason of denial. However, as with Miller, Sylvester could have easily determined the date of the charge and reinstated his original qualifying certification for unit 504; or at the very least, followed their application policy and allowed him priority on the Logan list because of his disability. Marlor questions the application list due to the number of applicants at the time he was put back on the list, November 1, 2021; the building was not completed, and he did not move in until February 16, 2022.

9.  He believes Sylvester and Miller gave misinformation and discriminated against him because unit 504 was accessible with grab bars by the toilet and shower, the washer and dryer were side by side and located in a separate room, and he was told he would be placed on a waiting list and unit 504 was available until April 28, 2022. Idaho Finance Association states that an apartment that has never been lived in is considered "Empty," until a qualifying Applicant moves in, and the unit then attaches the Applicant's qualifying program.

10. When he completed the housing application, he failed to fill out the "Voluntary Information" section to disclose his disability. He believes this to be a conscious decision and was made to discuss options with available units and their accessibility. He also believes this is a formality and would have had to be rectified before the application process even started, prior to his first certification. Further, he was wheelchair-bound on each occasion that the management and he met, while processing his application to obtain housing. It was clear that he required an accessible apartment.

11. Even though he attended all meetings with the management in his wheelchair, management recertified him for a non-accessible studio apartment in November of 2001, and on February 16, 2022, he moved into and has resided in a non-accessible studio apartment. When he moved into the studio apartment in his wheelchair, Miller informed him that it would be approximately one year before he would have the chance to move into a one-bedroom, accessible apartment.

12. In July of 2022, his neighbor moved out of the accessible unit 504. However, Miller informed him the cost of the unit was going to be adjusted to the current studio rate of unit 506 at $620 per month; rent would be $739. He asked for original qualifying documents that certified him for a one-bedroom at $520 per month, but Miller said, "...tell you right now they're not going to give you the one bedroom for $520 the remember I told you the one bedroom is now 739 and you would have to see if your income qualify for that amount And not even sure if they're gonna leave and let anybody transfer from a studio to the one bedroom" Even at the higher price Marlor continued with the transfer to an accessible one-bedroom unit, 504.

13. When he tried to turn in the transfer request, Miller told him that someone else was already interested in the apartment, and she rented it out. He later found out that even though he had completed the transfer request form in July of 2022, Miller failed to upload it into the system until October of 2022; therefore, shielding his request from management and nullifying any waiting list he was on. Further, he spoke to his neighbor right before he left and asked him when he applied for 504, he said April 25th and was accepted the 28th. Meaning, there was no waiting

223    list and therefore no applicants moved above him; the recertification was only utilized to take

224    away his original qualifying one-bedroom and charge more money for a non-accessible studio

225    apartment. Once an Applicant certifies, the qualifying amount only increases and or adjusted

226    when rent is raised. Meaning, when THC discarded his original certification and recertified him,

227    they illegally discriminated against him by instituting a non-accessible apartment at a higher

228    cost; ultimately, taking away an accessible one-bedroom and charging more for a non-accessible

229    studio.

230    14. He filed a complaint with the Intermountain Fair Housing Council on December 15, 2022, and he

231    was referred to the State Attorney General's Office and Volunteer Lawyers of Idaho. His

232    complaint was dismissed without declaring a substantial amount of THC's discrimination. The

233    specialist did not investigate and focused on whether he was denied housing because his

234    background check found a charge without a date associated with it. However, the fact that there

235    were contradicting cases, and he had appealed the application process, and his appeal was not

236    considered by the onsite and regional managers, should have been enough for an investigation.

237    Further, the fact that he was put on a list that did not exist, and THC cannot say that there was

238    no apartment available when there was in fact a minimal of two available apartments. He

239    received an email stating that they would not be taking on his case and Marlor could not

240    communicate all the issues or provide proof of THC ongoing discrimination; including his

241    attempts to communicate, Logan apartments do not have an accessible route. Include in

242    Intermountain Fair Housing Council's denial email is their mission statement  and because the

243    specialist informed him that his case was "consumer based" and referred him to the State

244    Attorney General; he replied, "this case is exactly what you guy handle."

245    15. Shortly after moving in on February 15, 2022, THC implemented a key card entry that requires

246    all visitors to call and let a resident know when they arrived and need in. Further, for a visitor to

247    gain access to the building, it requires Marlor to physically go to let them in; if Marlor is unable

248    to go let a visitor in, another resident lets them in, or they are not allowed to visit. Not only does

249    this require a visitor to have the residence's phone number, but it also requires both the

250    residents and visitors to have charged and functional phones. If these parameters are not met,

251    the guest has no way to contact a resident. This is discriminatory for both the visitors and

252    residents.

253    16. HUD's regulations require an accessible route to include a doorbell outside the main entrance

254    for a visitor to alert the residents. This system of design at Logan makes his home much more

255        non-accessible for his guests and himself. Marlor contacted onsite managers, regional

256        managers, and the asset manager, and communicated that the front door and the locking

257        system are barriers, but management ignores his complaints. No changes or requests for

258        accommodation have been made in consideration of his disabilities.

259    17. The front door is locked from 5:00pm to 8:00am on weekdays and all weekend. This is an

260        additional accessibility issue for Marlor. If he loses his keycard, he might be locked out for a long

261        period of time. If he was in a different housing situation, he would be able to call a locksmith

262        and have a key made. Not at Logan, that is, if he was just locked out of his apartment, then he

263        could hire a locksmith to make a key. He has requested a solution to this problem, but THC

264        ignores his requests for reasonable accommodation for both a transfer to an accessible one-

265        bedroom and a solution to the key card entry into the building.

266    18. Lucey residence and Logan's managers have access to an application that remotely unlocks the

267        doors and gives their guests access to the buildings. The architect personally informed Marlor

268        that both buildings were designed to utilize an application, but on-site managers have

269        communicated each resident that utilizes the application is charged and the owner of the

270        building will not pay for the additional costs for Logan's residences.

271    19. In November of 2022, Marlor sent an email to the regional manager but after getting no

272        response he called THC's front office and she said Logan had a new regional manager, the

273        previous one had accepted another position within the company. After leaving Kim [LNU] a

274        message she called him and requested all the text and email communication he had with the

275        onsite and regional managers and offered to work with him and allow him to transfer to an

276        accessible one-bedroom; Adam was asked to pull his file and the three of them would get

277        together. Adam communicated there were several issues with his application and in fact, there

278        were several issues with a lot of the residences' applications. When the first of the month came,

279        Adam would tell Marlor that the transfer would happen, but it would have to wait until the first

280        of the month, and then the first would come, and he would get told the same thing, the first of

281        the month.

282    20. Marlor had a couple incidence with Adam and visitors. The elevator was being tiled and Marlor

283        had a visitor and her phone was dead. The stairs are key card access only and when Adam asked

284        for the residences number to call, she could not give it to him. Knowing that his visitor was late

285        he had another friend go down to the floor entrance where they were confronted by Adam, and

286        they explained that Marlor was disabled and unable to use the elevator or stairs. By the time his

287     guest made it to his apartment, Adam was on the phone apologizing for not allowing his visitor

288     to use the stairs. The next time Marlor was waiting for a guest and another resident knocked at

289     his door and informed him that his guest was waiting to be let in the front door. Another guest

290     went to let the visitor in and a few minutes later Adam knocked at the door and was visibly mad

291     and started explaining that the residence just wanted to feel safe in the building. Marlor agreed

292     and Adam continued that we had just got rid of the problem tenants and again said that the

293     residence just wanted to feel safe in the building. Marlor was confused and again agreed with

294     him and then stated he was not sure what issues he was talking about and informed Adam that

295     he rarely left his apartment and did not know about the ongoing issues. Adam then said that

296     there were no problems with him, that he was working on getting him into the one-bedroom

297     and noticed he had calmed down from the state he was in when he arrived. The last incident is

298     when Adam knocked at Marlor's door and after letting him in Adam asked if he knew a

299     gentleman named Jay and he was friends with him. Marlor explained that he had met him but

300     they were not friends and that he knew he lived on the fourth floor. Adam then informed him

301     that one of his guests was in an unauthorized area and wanted to know where his guest was at.

302     Marlor said he would talk to her and find out what was going on. After talking to his friend, he

303     saw Adam out in the walk-way and explained that Jay had called his friend and had her go to his

304     apartment to check on his mom and take her a roll of toilet paper. Adam then stated Jay did not

305     live in the building and the cops had been called and were looking for him and that if he had any

306     more issues, he was going to have to evict him. Marlor then informed Adam that there had not

307     been any issues and that he did not know the guy except talking to him outside and that he was

308     doing to have to start writing him up because he has had no issues; Adam stated, "Guilt by

309     association." Marlor told Adam he could talk to him because he was right there, and he went

310     inside the building. Marlor noticed the entrance to the building was unlocked that weekend and

311     sent Adam an email asking that a couple of days of video be preserved and about the place

312     being unlocked and the residence being safe; Marlor found out Adam had left in the middle of

313     the night a few days prior.

314    21. THC's management kept changing and Adam left in the middle of the night, before he could

315     complete Marlor's transfer to a one-bedroom. Adam's last memo stated, "Access to the building

316     will be 24/7 key card access only." The memo prompted Marlor to call Kim and when she did not

317     answer, he asked for any available regional manager and spoke to Logan's next regional

318     manager, Mindy. She stated that she would talk with Kim and keep him informed. He spoke to

319        Mindy one more time and she said that she was busy with a project and would read his emails

320        and return his call on Friday, he never spoke to her again. However, Dean informed him that

321        Mindy had approved the transfer.

322    22. Roseanna Dean ("Dean") became his new onsite manager in April of 2023. Marlor informed her

323        about access to the building and the door being a barrier; visitors not being able to contact the

324        residence is discriminatory against both the visitor and resident. He asked her to research the

325        door issues and even sent her ADA regulations showing there must be a way for visitors to

326        contact residents via a doorbell outside the main entrance, that allows the visitors to alert the

327        residents. When Marlor informed her that access to the building was a barrier, she stated,

328        "According to you."

329    23. In July of 2023, Dean informed him that he was number five on the list to move into a one-

330        bedroom with accessible grab bars; Mindy had approved the transfer. Dean eventually offered

331        him a one-bedroom, 504, and informed him that rent would be $879 per month. At first, he

332        agreed to this, but he later decided it was too expensive; especially when he was certified for

333        the one-bedroom, 504, at $520 – plus at that time there would have been a $20 rent increase

334        and would be considered a reasonable accommodation. He turned down the opportunity

335        because he thought at the most, he should transfer at the current rent rate. They were not

336        transferring him from a studio to an accessible one-bedroom because of reasonable

337        accommodation.

338    24. Less than one month later, he found out a fully accessible apartment was becoming available,

339        407, and Dean told him he could have it after repairs were complete. Dean finally emailed him

340        back about this apartment on November 28, 2023, to ask if he was still interested in

341        transferring. He replied, "Yes, I've been waiting almost two years." but he did not hear back

342        from her.

343    25. He emailed Regional Managers Sylvester, Erika Zappa, Kim [LNU], and Mindy [LNU] about his

344        ongoing discrimination and that the onset was when he was denied housing. He communicated

345        that he was originally certified for a one-bedroom but because of case without an associated

346        date he was denied housing and was recertified for a non-accessible studio, but he never

347        received a response. Marlor believes these tactics are utilized by THCs' regional managers

348        because if they do not acknowledge his discrimination or requests for reasonable

349        accommodation, then he would seek help and would be denied because the use of an

350        applicant's criminal history for denial, is not considered discrimination.

351   26. When Marlor seeks help from disability advocating rights agencies they shield THC and owners
352         from being held accountable. It is obvious Marlor lives and has lived in a non-accessible unit but
353         cannot get an agency to understand that his housing situation is hazardous and has caused
354         injuries; he struggles every day to live in an apartment he should have never been placed in.
355         The Idaho Finance Association and HUD created THC and Marlor feels this has created
356         relationship between the three agencies and shows bias and alienates him from seeking resolve.
357         Further, it gives THC a predisposed disposition that they do not have to follow federal and state
358         regulations, statues, and or laws and do not have to adhere to HUD's administrative regulations.
359         Logan is tax-credit based, and THC did not have to receive HUD's certification like a Public
360         Housing Authority complex; however, in HUD's handbook it is highly suggested they know and
361         follow all regulations and laws because they can be held civilly liable for discrimination.

362   27. After leaving several messages with the Assets Manager Jennifer Rogers, she called him back
363         and she offered him a one-bedroom unit for $600 per month. Mindy and Miller had plans to
364         meet, and not wanting to cause friction between managers, he informed Jennifer of the planned
365         meeting and asked that the three of them come to some kind of consensus.

366   28. He cannot use the stacked washer and dryer that are located behind the door in the bathroom;
367         the circumference makes them inaccessible. The hall, fridge, and the layout of the bathroom do
368         not meet the strict measurements set by HUD's regulations, and the toilet and bathtub do not
369         have grab bars.

370   29. After falling multiple times while attempting to use the shower chair and toilet, Marlor resorted
371         to only taking birdbaths. It was too dangerous to try to shower where there are no grab bars,
372         and it is not set up for someone in a wheelchair. After one of the falls, he spent a night on the
373         floor and his phone was dead. Maintenance came to check the fire alarms and retrieved his
374         charger for him but shortly after they left, he noticed his phone was not charging. Pain from his
375         arthritis had subsided enough that he was eventually able to use his wheelchair and the toilet to
376         get back into his wheelchair. Another incident when he failed to transfer, he ended up dragging
377         his wheelchair from the bathroom across his apartment to his studio bedroom and got up into
378         his wheelchair after getting up onto the couch. Another fall, 911, was utilized and the first
379         responders were able to assist him back into his wheelchair. Marlor has since gone to a bench
380         and is able to somewhat utilize the bathtub without any more falls.

381   30. In mid-December, Dean asked Marlor what day he wanted to sign the lease. He replied, "As
382         soon as possible," but again, he did not hear back from her. Then toward the end of December,

383    Dean informed him that he made too much money to qualify for the lease he planned to sign.

384    She added, Thomas Logan would continue working on it.

385    31. He did not pay his rent in December of 2023 and stated that he would pay rent as soon as the

386    transfer was completed. All he needed was to have the money transferred into his account, and

387    in fact in January of 2024, he paid $1000, and that amount should have covered January 2024

388    and half of what he was behind from October 2023. Marlor received an email that he would not

389    be able to transfer to the open accessible unit, he made too much money. He informed Dean he

390    would not be paying rent and that a judge could hear about the hazardous living conditions and

391    injuries that he has endured. In the end of 2024, he was served notice of eviction court and he

392    went and paid $2,500 on his rent. Dean had requested him to come to the office and talk about

393    his unpaid balance but because of health issues and her leaving early every day, they had issues

394    meeting up. Finally, he was able to sign the recertification paperwork and informed Dean that

395    he would be catching up on rent. The day after receiving the summons to eviction court, an

396    advocating homeless agency called, and when Marlor informed the gentleman why he had not

397    been paying rent and wanted to go before a judge, he was informed that by law, the only reason

398    a tenant can justify not paying rent, is cost to replace fire detectors. Marlor went and paid

399    $2,500 on back rent but because of late fees he was still $1,800 short and never brought up the

400    discrimination and hazardous living conditions to the judge; he went and filed this lawsuit.

401    32. He had asked for reasonable accommodation to be transferred from three different on-site

402    managers, six regional managers; and their boss, the assets manager, and he still resides in a

403    non-accessible studio apartment. THC purposely denied him federally assisted housing, and

404    purposely said the cause was due to the results of Marlor's background check. They knew the

405    results of an Applicant's background check as a reason to deny an Applicant housing is not

406    considered discrimination.

407    33. Marlor also has issues when the building loses power, the only elevator stops working and he

408    has no access to leave the 5th floor. Marlor is suspicious how the Thomas Logan building passed

409    Boise City's inspection. The elevator does not work when the power goes out and the generator

410    supplying power to both sister buildings could be an issue; nevertheless, the only elevator is not

411    working when the power and continues not to work for a considerable amount of time after

412    power is restored and discriminates against Marlor's disability.

413    34. There is a handicap accessible parking spot behind Lucey apartments and his friend received a

414    ticket from a private enforcement parking company, even though Marlor's placard was properly

415     placed on the rearview mirror. Marlor was successful in having the ticket dismissed but not
416     because of federal Public Law 101-336, Americans with Disabilities act of 1990; it was dismissed
417     due to no other tickets being issued on the car's license plate.  The law allows anyone who has a
418     disability and is displaying a disability placard or license plate to park in any public, assessable,
419     and designated handicap spot. Marlor tried to explain the statute, but she insisted that the car
420     needs to display a Lucey sticker, and required placard or license plate, to be parked in that
421     handicap spot. This is just another example of the owner of the building discriminating against
422     people with disabilities. If a person is disabled and displays a lawful handicap placard or license
423     plate, but does not have sticker for the Lucey apartments, they can receive a ticket and risk
424     being towed.
425
426
427     THIRD PARTY
428     Enablers and Ongoing Discrimination:
429
430     In January 2024 HUD reopened Marlor's complaint and after having a brief overview with the
431     supervisor, he was under the impression he would finally get some help. He had a lengthy phone
432     call with the intake specialist and emailed several pages that detailed THC discrimination from
433     September 2021 to January 2024. HUD is responsible for a long list of duties but one of them is
434     to evaluate complaints for discrimination and once a valid complaint is found, HUD uses their
435     resources to correct discrimination, to discourage future discrimination, and to give the
436     complainant relief for the injuries. For the specialist to fully understand how THC is
437     systematically and continually discriminating against Marlor, she would first have to recognize
438     that he was denied housing, not because of his background check, but because THC did not
439     want him in the Logan. However, the specialist would not go to the origins of his discrimination,
440     so she was unable to recognize its onset, that it is ongoing, and that there are numerous and
441     separate, distinct violations.
442
443     Marlor believes the relationship between advocating rights agencies and THC, was formulated
444     when HUD and Idaho Finance Association created THC and has evolved into an unhealthy
445     management company; the reason why HUD, Intermountain Fair Housing Council, Idaho Legal
446     Aid, and Idaho Human Rights Commission are biased, and will not follow through with Marlor's

447    complaints of discrimination. It is implausible to conclude, when it disregards the fact that

448    Marlor has been living, is living, in a non-accessible studio apartment; that does not equate to

449    discrimination. Especially, when he has communication between all the on-site and regional

450    managers, and assets managers that ignore his ongoing hazardous living conditions and their

451    inability to grant him reasonable accommodation.

452

453    Not only did THC have in place a written policy that discriminated against Marlor by not allowing

454    him to contest an alleged charge found in his background check before adverse action is taken,

455    but they also fabricated the reason that gave them grounds to deny him housing. Further, they

456    have Applicants sign a paper that released all of THC's agents from liability when they utilize

457    information from a background check. Marlor believes that THC strategically and purposely

458    fabricated a case without an associated date and then when Marlor did not find housing

459    elsewhere they retaliated and recertified him. As THC's agents knew that Marlor would not be

460    finding help because they used his background check to deny him housing and it cannot be the

461    basis for discrimination. From the time THC's agents recertified him and gave him less for more,

462    their acts of discrimination were committed without reprieve and were blatant; their

463    connections and relationships backed them.

464

465    THC manages over 50 property complexes and are experienced and knowledgeable in all

466    aspects, including keeping Marlor paying more for less and in addition, renting out his qualifying

467    one-bedroom. HUD and Idaho Finance Association established THC and Marlor believes this

468    relationship allows them to employ the tactics utilized to deny him housing and then recertify

469    him and qualify him with a new base rent amount that gives them ability to deny him transfers

470    because of his income. In short, it allows them to operate and seem to be incompliance while

471    discriminating against Marlor. It takes a knowledgeable and experienced company to circumvent

472    applicable governing laws and regulations while maintaining a persona they are complying;

473    especially when facing complaints of discrimination. THC denied Marlor housing and established

474    a new qualifying, irreversible base rent, for a non-accessible studio apartment. Then at every

475    opportunity they stalled, denied, changed management, ignored, did not honor waiting lists, or

476    fulfill approved transfers; and when he sought help through advocating disability agencies,

477    THC's long and established relationships prevailed. Marlor tried HUD, Intermountain Fair

478    Housing Commission, Idaho Legal Aid, ACLU, and other disability rights advocating agencies in

479     holding THC accountable; they found no discrimination by THC and denied representing him.

480     HUD's reason for not taking further action was based on these factors:

481

482     a.   The alleged discrimination based on disability is non-jurisdictional because you did not
483          articulate that the housing provider denied the one-bedroom apartment for $520 and
484          rented the studio for $620 a month because of your protected class, disability. Even if
485          you would state that the denial to rent by the housing provider was due to the
486          protected class. More than one year from the date of the alleged violations has elapsed
487          and this office cannot take any action on your allegations.

488

489     b.   You stated that you did not submit reasonable accommodation for a handicap unit due
490          to your disability.

491

492     c.   Since you did not request reasonable accommodation for an exception to the property
493          management's new policy for access of the building due to your disability, the alleged
494          discrimination based on disability is non-jurisdictional because the new policy applied to
495          all residents in the building.

496

497     d.   Since the property where you reside is not federally funded and not a public entity, HUD
498          cannot enforce ADA.

499

500     THC's application depicts a knowledgeable and experienced company in the management of

501     properties. Currently THC manages over 50 properties and processes and certifies hundreds of

502     applicants each year and their experience manifests while processing Marlor's application; however,

503     their intentions were not in Marlor's best interests. From the onset THC's managers cleared a path

504     for housing but the path led to any housing but the Logan; they denied him. For THC to deny Marlor

505     housing and then take the position his background check found a case without an associated date,

506     at first, seemed plausible. However, when one takes their history, experience, knowledge, and start

507     analyzing the information they possessed when they denied Marlor, their story and or proffered

508     reason to deny him housing does not add up. The procedures and policies found in THC's application

509     were not followed while processing Marlor's application. He was not treated equally or fairly, and

510     THC's managers cannot say that mistakes were made because the discrimination against Marlor

511     manifested when they denied him housing. Then, performing the set-aside test again to recertify

512     him for a non-accessible studio apartment, recertifying him established a higher rent amount and

513     allege he would not qualify for transfers, and if he tried to file discrimination charges, they could

514     readily take the position he made too much money. Marlor called the local HUD office and left

515     several messages but a call center in Utah would call him back and they informed him to call the

516     same number to the Seattle, WA office. After the specialist answered his call several times, she said

517    she would email someone that might be able to help and informed him that the Boise HUD does not

518    return any calls or answers the phone. Marlor did receive a call back and the specialist and himself

519    looked at his income and came to the same conclusion, Marlor did not make too much money and

520    therefore he qualified for both the original one-bedroom and the accessible one-bedroom. THC did

521    not place him on the list for Logan, and if the list existed, it did not represent the accessible one-

522    bedroom, unit 504, that was available until April 2022. The discrimination continued as Marlor's

523    efforts to transfer for the next three years never came to fruition for various reasons. Even though

524    regional managers approved of Marlor's transfers, and he complied with their requests by emailing

525    them text and email communication; not once did they respond. THC application states the

526    following:

527

528        NON-DISCRIMINATION: The management agent shall comply with all federal, state and
529        local fair housing and civil rights laws and with all equal opportunity requirements as
530        required by law, including without limitation HUD administrative procedures. Federal
531        laws forbid discrimination based on race, color, creed, religion, sex, age, disability,
532        familial status, or national origin. Discrimination against a particular social or economic
533        class is also prohibited (for example: welfare recipients; single parent households, etc.)
534        These requirements apply to all aspects of tenant relations including without limitation:
535        accepting and processing applications, selecting residents from among eligible
536        Applicants on the waiting list, assigning units, certifying and re-certifying eligibility for
537        assistance, granting accommodation and terminating tenancies

538

539

540    The Idaho Human Rights Commission (IHRC) reviewed Marlor's complaints Against THC and found

541    that no violations of discrimination had occurred; Marlor believes the IHRC found several violations.

542    They start off quoting THC's response to Marlor's complaint, "There are a finite and limited number

543    of low-income apartments available in the complex, as well as a finite and limited number of

544    accessible dwelling units that are also low income." Problem with THC and the IHRC using this

545    statement, even though it may be true, that there was no need to recertify him and give him a

546    higher base rent and take away his original accessible one-bedroom; thus, making him ineligible and

547    easier for them to deny him future transfers. Further and more damning, they say no apartments

548    were available, when 504 was available until April 2022, and Marlor was on the waiting list for a

549    one-bedroom. In addition, when he was told he lost his original qualifying one-bedroom and rent

550    amount, the construction on the Logan was not completed; there was no waiting list. The IHRC

551    changes Marlor's timeline to say that he was denied a transfer to 504 because his transfer was not

552    processed, and THC had already rented it out. Another example of turning a blind eye on Marlor's

553    complaint and then changing his dialog in their denial letter to assimilate no discrimination: in the

554    end omitting several acts. Marlor supplied a long list of codes, laws, and regulations THC's agents

555    violated and IHRC states that none were provided; even listing each of THC's answers to his

556    complaint, and in detail, negating their answers by providing proof or making them implausible.

557

558    After Idaho Human Rights Commission found no evidence of discrimination, THC's onsite manager

559    said that the Logan was implementing a new lock system for the front door and would not purchase

560    fobs. From August 2024 to March 2025 Marlor was issued two keys and that was after waiting

561    months and asking several times. Finally, after Marlor asked Emma, the fourth onsite manager,

562    about getting a key, she said Michael had ordered some and was issued two new keys. In December

563    2024 Marlor turned in a request for accommodation for an accessible one-bedroom and it had been

564    signed by his primary physician and stated Marlor is disabled and needed accommodations. The

565    request included the need to be supplied with how many people were on the waiting list and where

566    he was on the list. Marlor received an email from the seventh regional manager, and she informed

567    him that he would be getting communication on his accommodation request and in fact she was

568    moving into the position of ADA compliance officer. February 2025 Marlor received an email from

569    Rossanna regarding signing some paperwork and she informed him that he now qualified for the

570    fully accessible one-bedroom. Not long after he received an email from the ADA compliance officer

571    stating there would be a rent increase with his accommodating one-bedroom; rent would go up to

572    $765 because of the extra amenities and square footage. Marlor moved into the one-bedroom and

573    noticed there were no grab bars by the toilet and the roll-in shower's grab bars are located on the

574    opposite side of the of the shower and cannot be utilized in conjunction with the folding bench.

575    However, the washer and dryer are not stacked and is accessible; as is the microwave, the kitchen

576    sink, the door's peephole, the fridge, and all the doors are wider and allow for easy access.

577    Apartment 407 is the same apartment he was denied because THC contends; Marlor's income put

578    him in the 50% to 60% and therefore was ineligible. The person that moved to a different apartment

579    so Marlor could transfer was not disabled.  In fact, before she moved into 407 it was vacant for

580    several months.

581

582    THC's onsite managers, regional managers, assets managers, program coordinators, architects, and

583    owners are all liable; albeit, some more and some less. They are responsible for discriminating

584    against Marlor's disabilities from the start of the Logan application process in September 2021 and

585    continue well into 2025. As a third party and the power to intervene, not only to end the
586    discrimination, but hold THC accountable; not only for Marlor, but all the disabled individuals THC
587    manages. Therefore, HUD, Intermountain Fair Housing Council, Idaho Human Rights Commission,
588    and Idaho Legal Aid are disability rights advocating agencies and instead of intervening and
589    representing Marlor and holding THC accountable; they found no discrimination by THC and denied
590    him assistance and exacerbated the discrimination.
591
592    Regulations Violated:
593
594    1.    A person is directly liable for:
595            A.    The person's own conduct that results in a discriminatory housing practice.
596            B.    Failing to take prompt action to correct and end a discriminatory housing practice by
597                    that person's employee or agent, where the person knew or should have known of the
598                    discriminatory conduct.
599            C.    Failing to take prompt action to correct and end a discriminatory housing practice by a
600                    third-party, where the person knew or should have known of the discriminatory
601                    conduct and had the power to correct it. The power to take prompt action to correct
602                    and end a discriminatory housing practice by a third party depends upon the extent of
603                    the person's control or any other legal responsibility the person may have with respect
604                    to the conduct of such third-party. 24 CFR 100.7(a)(1)(i), 24 CFR 100.7(a)(1)    24 CFR
605                    100.7(a)(1)(i), 24 CFR 100.7(a)(1)(ii), 24 CFR 100.7(a)(1)(iii)
606
607    2.    Vicarious liability.  A person is vicariously liable for a discriminatory housing practice by the
608            person's agent or employee, regardless of whether the person knew or should have known of
609            the conduct that resulted in a discriminatory housing practice, consistent with agency law.
610            24 CFR 100.7(a)(b)
611    3.    Deny a qualified individual with handicaps the opportunity to participate in, or benefit from, the
612            housing, aid, benefit, or service; 24 CFR 8.4(b)(1)(i)
613    4.    Afford a qualified individual with handicaps an opportunity to participate in, or benefit from, the
614            housing, aid, benefit, or service that is not equal to that afforded to others; 24 CFR 8.4(b)(1)(ii)

615    5. Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not
616       as effective in affording the individual an equal opportunity to obtain the same result, to gain
617       the same benefit, or to reach the same level of achievement as that provided to others.
618       24 CFR 8.4(b)(1)(iii)

619    6. Provide different or separate housing, aid, benefits, or services to individuals with handicaps or
620       to any class of individuals with handicaps from that provided to others unless such action is
621       necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services
622       that are as effective as those provided to others.
623       24 CFR 8.4(b)(1)(iv)

624    7. Aid or perpetuate discrimination against a qualified individual with handicaps by providing
625       significant assistance to an agency, organization, or person that discriminates on the basis of
626       handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's
627       federally assisted program or activity; 24 CFR 8.4(b)(1)(v)

628    8. Deny a dwelling to an otherwise qualified buyer or renter because of a handicap of that buyer or
629       renter or a person residing in or intending and eligible to reside in that dwelling after it is sold,
630       rented or made available; 24 CFR 8.4(b)(1)(vii)

631    9. Otherwise limit a qualified individual with handicaps in the enjoyment of any right, privilege,
632       advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid,
633       benefit, or service. 24 CFR 8.4(b)(1)(viii)

634    10. New multifamily housing projects (including public housing and Indian housing projects as
635       required by § 8.25) shall be designed and constructed to be readily accessible to and usable by
636       individuals with handicaps. 24 CFR 8.22(a)

637    11. Owners and managers of multifamily housing projects having accessible units shall adopt
638       suitable means to assure that information regarding the availability of accessible units reaches
639       eligible individuals with handicaps, and shall take reasonable nondiscriminatory steps to
640       maximize the utilization of such units by eligible individuals whose disability requires the
641       accessibility features of the particular unit. To this end, when an accessible unit becomes vacant,
642       the owner or manager before offering such units to a non-handicapped applicant shall offer
643       such unit: 24 CFR 8.27(a)

644         1- First, to a current occupant of another unit of the same project, or comparable projects
645           under common control, having handicaps requiring the accessibility features of the

646               vacant unit and occupying a unit not having such features, or, if no such occupant exists,

647               then 24 CFR 8.27 (1)

648         2- Second, to an eligible qualified applicant on the waiting list having a handicap requiring

649            the accessibility features of the vacant unit.   24 CFR 8.27 (2)

650   12. Refuse to sell or rent a dwelling after a bona fide offer has been made, or to refuse to negotiate

651      for the sale or rental of a dwelling because of race, color, religion, sex, familial status, or national

652      origin, or to discriminate in the sale or rental of a dwelling because of handicap.

653      24 CFR 100.50(b)(1)

654   13. Discriminate in the terms, conditions or privileges of sale or rental of a dwelling, or in the

655      provision of services or facilities in connection with sales or rentals, because of race, color,

656      religion, sex, handicap, familial status, or national origin. 24 CFR 100.50(b)(2)

657   14. Engage in any conduct relating to the provision of housing which otherwise makes unavailable

658      or denies dwellings to persons because of race, color, religion, sex, handicap, familial status, or

659      national origin. 24 CFR 100.50(b)(3)

660   15. Make, print or publish, or cause to be made, printed or published, any notice, statement or

661      advertisement with respect to the sale or rental of a dwelling that indicates any preference,

662      limitation or discrimination because of race, color, religion, sex, handicap, familial status, or

663      national origin, or an intention to make any such preference, limitation or discrimination.

664      24 CFR 100.50(b)(4)

665   16. Represent to any person because of race, color, religion, sex, handicap, familial status, or

666      national origin that a dwelling is not available for sale or rental when such dwelling is in fact

667      available. 24 CFR 100.50(b)(5)

668   17. It shall be unlawful for a person to refuse to sell or rent a dwelling to a person who has made a

669      bona fide offer, because of race, color, religion, sex, familial status, or national origin or to

670      refuse to negotiate with a person for the sale or rental of a dwelling because of race, color,

671      religion, sex, familial status, or national origin, or to discriminate against any person in the sale

672      or rental of a dwelling because of handicap. 24 CFR 100.60 (a)

673         1- Failing to accept or consider a *bona fide* offer because of race, color, religion, sex,

674            handicap, familial status, or national origin. 24 CFR 100.60(b)(1)

675         2- Refusing to sell or rent a dwelling to, or to negotiate for the sale or rental of a dwelling

676            with, any person because of race, color, religion, sex, handicap, familial status, or

677            national origin. 24 CFR 100.60(b)(2)

678          3-   Imposing different sales prices or rental charges for the sale or rental of a dwelling upon

679             any person because of race, color, religion, sex, handicap, familial status, or national

680             origin. 24 CFR 100.60(b)(3)

681          4-   Using different qualification criteria or applications, or sale or rental standards or

682             procedures, such as income standards, application requirements, application fees, credit

683             analysis or sale or rental approval procedures or other requirements, because of race,

684             color, religion, sex, handicap, familial status, or national origin. 24 CFR 100.60(b)(4)

685          5-   Conditioning the availability of a dwelling, including the price, qualification criteria, or

686             standards or procedures for securing the dwelling, on a person's response to

687             harassment because of race, color, religion, sex, handicap, familial status, or national

688             origin. 24 CFR 100.60(b)(6)

689    18. It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national

690        origin, to impose different terms, conditions or privileges relating to the sale or rental of a

691        dwelling or to deny or limit services or facilities in connection with the sale or rental of a

692        dwelling. 24 CFR 100.65(a)

693    19. Failing to process an offer for the sale or rental of a dwelling or to communicate an offer

694        accurately because of race, color, religion, sex, handicap, familial status, or national origin.

695        24 CFR 100.65(b)(3)

696    20. Limiting the use of privileges, services or facilities associated with a dwelling because of race,

697        color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person

698        associated with him or her. 24 CFR 100.65(b)(4)

699    21. It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national

700        origin, to provide inaccurate or untrue information about the availability of dwellings for sale or

701        rental. 24 CFR 100.80(a)

702    22. Indicating through words or conduct that a dwelling which is available for inspection, sale, or

703        rental has been sold or rented, because of race, color, religion, sex, handicap, familial status, or

704        national origin. 24 CFR 100.80(b)(1)

705    23. It shall be unlawful to discriminate in the sale or rental, or to otherwise make unavailable or

706        deny, a dwelling to any buyer or renter because of a handicap of-

707            1-   That buyer or renter; 24 CFR 100.202(a)(1)

708            2-   A person residing in or intending to reside in that dwelling after it is sold, rented, or

709              made available; or 24 CFR 100.202(a)(2)

710            3-   Any person associated with that person. 24 CFR 100.202(a)(3)

711    24. It shall be unlawful to discriminate against any person in the terms, conditions, or privileges of
712        the sale or rental of a dwelling, or in the provision of services or facilities in connection with
713        such dwelling, because of a handicap of—That buyer or renter; 24 CFR 100.202(b)(1)
714    25. A person residing in or intending to reside in that dwelling after it is sold, rented, or made
715        available; or Any person associated with that person. 24 CFR 100.202(b)(2)(3)
716    26. It shall be unlawful for any person to refuse to make reasonable accommodations in rules,
717        policies, practices, or services, when such accommodations may be necessary to afford a
718        handicapped person equal opportunity to use and enjoy a dwelling unit, including public and
719        common use areas. 24 CFR 100.204(a)
720    27. Covered multifamily dwellings for first occupancy after March 13, 1991 shall be designed and
721        constructed to have at least one building entrance on an accessible route unless it is impractical
722        to do so because of the terrain or unusual characteristics of the site. 24 CFR 100.205 (a)
723    28. All covered multifamily dwellings for first occupancy after March 13, 1991 with a building
724        entrance on an accessible route shall be designed and constructed in such a manner that—
725          1- The public and common use areas are readily accessible to and usable by handicapped
726             persons; 24 CFR 100.205 (c)(1)
727          2- All the doors designed to allow passage into and within all premises are sufficiently wide
728             to allow passage by handicapped persons in wheelchairs; and 4 CFR 100.205 (c)(2)
729            -  An accessible route into and through the covered dwelling unit;
730               4 CFR 100.205 (c)(2)(ii)
731            -  Usable kitchens and bathrooms such that an individual in a wheelchair can
732               maneuver about the space. 4 CFR 100.205 (c)(2)(iv)
733
734    29. Quid pro quo harassment. Quid pro quo harassment refers to an unwelcome request or
735        demand to engage in conduct where submission to the request or demand, either explicitly or
736        implicitly, is made a condition related to: The sale, rental or availability of a dwelling; the terms,
737        conditions, or privileges of the sale or rental, or the provision of services or facilities in
738        connection therewith; or the availability, terms, or conditions of a residential real estate-related
739        transaction. An unwelcome request or demand may constitute quid pro quo harassment even if
740        a person acquiesces in the unwelcome request or demand. 24 CFR 100.600 (a)(1)
741    30. Hostile environment harassment. Hostile environment harassment refers to unwelcome
742        conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental,

743    or use or enjoyment of a dwelling; the terms, conditions, or privileges of the sale or rental, or

744    the provision or enjoyment of services or facilities in connection therewith; or the availability,

745    terms, or conditions of a residential real estate-related transaction. Hostile environment

746    harassment does not require a change in the economic benefits, terms, or conditions of the

747    dwelling or housing-related services or facilities, or of the residential real-estate transaction.

748    24 CFR 100.600 (a)(2)

749

Gregory R. Mesbor

April, 14, 2025